THE STATE OF OHIO *v.* KIRCHNER.

(Nos. 84 CRB 14992 A and B—Decided September 20, 1984.)

Hamilton County Municipal Court.

*Charles F. Dorfman,* for plaintiff.
*H. Fred Hoefle,* for defendant.

PAINTER, J. This matter came on for trial on September 13, 1984. The defendant, William Kirchner, stood charged with aggravated menacing, R.C. 2903.21, and resisting arrest, R.C. 2921.33.

The evidence adduced presented, at the very least, a bizarre situation. Cincinnati Police Officers Randy Froehlich and Steve Means received a radio dispatch to an address at 1209 Main Street in the "Over-the-Rhine" section of Cincinnati. The reason for the dispatch was "man nailing snake to door."

Upon the officers' arrival on the third floor of the above address, they did in fact discover a five-foot-long black snake which had been nailed through its head to the door of defendant's apart-ment. Though the record is silent on the point, assumedly the snake was deceased.

Quite naturally, the officers knocked on defendant's door, which defendant answered, and sought to question defendant concerning the snake. The officers asked if they could come in and talk with the defendant, to which he replied, "no." The entire situation deteriorated from that point forward, resulting in the events in this court.

Quite obviously, the defendant had a right, under the Fourth Amendment to the United States Constitution, to refuse to allow the officers to enter absent a warrant or perhaps exigent circumstances, which did not exist in this case. Of course, a prudent man would have talked with the officers to resolve the situation, but the Constitution applies to both prudent and imprudent men.

Defendant testified that the snake was not his, he had not nailed it to the door, and since it was not his snake, he did not believe it to be his responsibility to remove it. Defendant believed that the caretaker of the apartment building would eventually remove the snake, which had been hanging for approximately eight hours. Defendant did not wish to converse with any police officer, because he and his friends were engaged in a social visit, involving the use of Wild Irish Rose wine.

Defendant had on his person a folding knife in a sheath on his belt. There is some dispute as to whether or not the knife was in his hand at any time. Defendant stated that he stepped back, putting his hand on his hips, to refuse entry of the officers. The officers perhaps naturally interpreted this as "going for" his knife, drew their weapons, and proceeded to disarm and arrest the defendant. A short struggle ensued, after which defendant was handcuffed and led away.

Certainly, the officers cannot be

faulted for asking the defendant the origin and purpose of the black snake. Though police officers naturally become inured to many things in the inner city, this incident was at least somewhat outside the normal realm. The defendant, in refusing entry to the officers, was exercising his Constitutional right, though he can certainly be faulted in the manner in which he did so. It is clear to this court that, had the defendant allowed the officers to enter, explained the situation, and acted the gentleman, the incident would have been closed, and perhaps someone would have removed the snake. As it turned out, the defendant was removed and the fate of the snake does not appear from the record.

The question remains as to what, if any, laws the defendant had violated. It might be noted that no charges were filed against anyone in connection with the mistreatment of the snake. Under Cincinnati Municipal Code Section 701-11, "[n]o person shall * * * cruelly beat, mutilate * * * any animal * * *." An "animal" is defined in Section 701-1-A as follows: " '[a]nimal' shall, for the purposes of Sections 720-11 and 720-13, mean and include every living dumb creature." The above definition would obviously include a snake, though the inartful wording might imply that it would be perfectly legitimate to torture a talking parrot. Be that as it may, since the defendant denied nailing the snake to the door, the officers were evidently not able to determine the identity of the nailor, the nailee obviously being unable to testify.

We do not find that defendant's actions, considering that they took place within the defendant's own apartment, beyond a reasonable doubt under the circumstances here, constitute the crime of aggravated menacing. Perhaps the entire matter could be classified under "aggravated foolishness," though there is no section in the Revised Code proscribing such conduct. If there were, our jails would be a great deal more crowded than they are presently.

We do believe from the testimony adduced that the defendant did resist his arrest. This was only in refusing to be handcuffed, and precipitating a short struggle. Though a defendant cannot be convicted of resisting arrest unless there was a "reasonable basis" for the arrest (*State* v. *Johnson* [1982], 6 Ohio App. 3d 56), we find that the defendant's conduct here, while not amounting to an offense beyond a reasonable doubt, did supply the officers, in this bizarre circumstance, with a "reasonable basis" for arresting the defendant. Whether the arrest stands up to the antiseptic scrutiny of the courtroom and the Constitution, one must remember that some incidents must be viewed in light of the conditions then existing in the real world outside the courtroom. This court cannot find that the officers acted unreasonably, even though the defendant is not guilty beyond a reasonable doubt of the underlying offense of aggravated menacing.

The court has found the defendant guilty of resisting arrest. Taking into account all of the surrounding circumstances, the fact that the defendant was incarcerated, and the defendant's demeanor in the courtroom, we believe that sufficient punishment has been accomplished. Therefore the sentence of the court is that costs be remitted, and that the defendant be sentenced to one day, for which he is given credit for the day already served.

*Judgment accordingly.*