[No. C031869. Third Dist. Nov. 29, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
MODESTO RUIZ BANIQUED et al., Defendants and Appellants.

14

**COUNSEL**

Thomas N. Thomson for Defendants and Appellants.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DAVIS, Acting P. J.**—Confronting here a scene of undeniable horror, it brings to mind the cogent observation of Mark Twain that "[man] is the only creature that inflicts pain for sport, knowing it to *be* pain." (2 Twain [Samuel Langhorne Clemens], Autobiography (1924) p. 7.) In this case we hold that a rooster or other bird falls within the statutory definition of "every dumb

creature" (Pen. Code, § 599b) and thus qualifies as an "animal" for purposes of the animal cruelty statutes found at Penal Code section 597, subdivisions (a) and (b).[1] We therefore affirm the judgments, including defendants' felony convictions under those animal cruelty statutes for crimes related to cockfighting.

## PROCEDURAL BACKGROUND

A jury found defendant Modesto Ruiz Baniqued guilty of three felony violations of the animal cruelty statutes: maliciously and intentionally maiming, torturing or wounding living animals, to wit, roosters (§ 597, subd. (a), count 1); subjecting animals to needless suffering (§ 597, subd. (b), count 2); and cruelly killing live animals, to wit, roosters (§ 597, subd. (b), count 3).

Baniqued was also found guilty of four misdemeanors: permitting cocks to fight on premises under his charge or control (§ 597b, count 4); owning, possessing, keeping or training birds, to wit, roosters, with the intent that the birds be used in an exhibition of fighting (§ 597c, count 5); manufacturing, buying, selling, bartering, exchanging, or possessing gaffs, slashers, or other sharp instruments designed to be attached in place of the natural spur of a gamecock or other fighting bird (§ 597i, count 6); and owning, possessing or keeping a cock with the intent that it be used or engaged in an exhibition of fighting (§ 597j, count 7).

Defendant Gonzalo Mari Bito was found guilty of a felony violation of subjecting animals to needless suffering. (§ 597, subd. (b), count 2.)

As to each defendant, the trial court suspended imposition of the sentence and granted four years' formal probation, subject to terms and conditions, and imposed various fines and fees.

## FACTUAL BACKGROUND

### A. *Cockfights at Baniqued's Property*

Defendants do not dispute the evidence which, when viewed in the light most favorable to the judgment, may be summarized as follows: About 9:55 p.m. on July 26, 1997, Sacramento County Sheriff's Department officers received information about cockfights in progress at defendant Baniqued's rural property. The caller stated the cockfights were run by a man named

---

[1]Solely for the sake of simplicity and in the context of this opinion, we refer to section 597, subdivisions (a) and (b) by the shorthand phase "animal cruelty statutes." All statutory references are to the Penal Code except as otherwise specified.

Modesto, which is defendant Baniqued's first name. The dispatch call indicated that about 100 persons were attending the cockfights.

The cockfights were over by the time Officer Jody Tennis reached the scene about 10:25 p.m. Upon arrival, she went toward a large barn on the property. About five persons who had been standing near the barn entrance ran away as soon as one of the patrol cars approached. The officer identified herself and ordered them to stop, but they ignored her. Three or four of them went inside the barn and closed the door behind them.

Officer Tennis radioed for assistance; an officer responded about a minute later. The two officers searched the barn. When Officer Tennis opened the door, there was a stench that turned her stomach. It smelled like "something burnt had died or something that died burnt." Inside, the officer found numerous half-dead roosters who were bleeding and dying. They had suffered large, gaping wounds. She also found several dead roosters, and there was blood in many places.

The inside of the barn was like a "catacomb or maze," with a number of rooms on the ground floor. The first room had a dirt floor and looked like it was used previously as a horse stall. Dead or dying birds were inside. After passing through a long, narrow passageway, the officer found several metal cages containing birds.

Another room had a large pit in a dirt floor. Blood, feathers, and dead birds were in the pit area. There was blood in the center of the pit. Dying birds were on the ground. There were about 30 dead and dying birds, and about 25 live birds. The officer saw a bucket containing birds' feet and legs, and the amount of fresh blood near and on them suggested they had been there only a short time. There were a couple of sacks full of dead roosters. There was also a stench in the pit area.

Also in the pit area were a large number of torn pieces of paper with writing on them, which appeared to be betting slips. The officer also found numerous curved, pointed and very sharp knives or gaffs.

Another officer testified that he found gaffs in the barn. "Gaff" is a general term for a weapon attached to a rooster used in cockfighting. He did not know the difference between a gaff and a device known as a "two-inch knife" or "Filipino slasher." The officer found dead birds in the kitchen area of the barn, in barrels, in various pens, and "all over the place." He saw about 50 dead or dying birds. There was a total of about 100 birds in the

barn. Some of the live birds were in transportation cases near the pit area. Two detached bird feet were found in a watering or feed dish.

The officers continued searching the barn and ultimately located both defendants and other persons hiding in a room past the kitchen. Bito had blood on his clothing. Baniqued was "covered with blood." Two caged roosters were found inside a Blazer parked at the property. The officers also found a burn barrel that had a stomach-turning smell. There were feathers around the barrel and burnt bird carcasses inside it.

In a statement he gave to an officer on the night of the incident, Baniqued denied any knowledge of cockfighting or dead birds on his property. However, a search revealed several betting slips inside one of Baniqued's pockets. Defendant Bito admitted that he arrived at 10:00 a.m. to attend the cockfights, that he had seen about 10 fights, and that he had won about $60 gambling on them.

### B. *Expert Testimony on Cockfighting*

Eric Sakach, an employee of the Humane Society of the United States, testified as an expert on cockfighting based on his training and experience. Gaffs or slashers are attached in various ways to the natural spurs on the legs of gamecocks. The purpose of gaffs or slashers is to inflict lethal wounds. Cockfights usually last only 5 to 10 minutes because the gaffs and slashers cause so much damage to the birds that one or both are mortally wounded fairly quickly.

The most common types of cockfighting in North America involve long-heel or short-heel "gaffs." "Gaffs" are implements resembling curved ice picks or needles, which are attached to both legs of the bird. Another kind of cockfighting involves what is known as a "long knife" or "Filipino slasher," which is a knife two and one-half to three and one-half inches long. These slashers are attached only to one leg of the rooster. "Short knife" or "Mexican slasher" cockfighting uses a knife that is one to three inches long. Another variety uses a "postiza," which is shaped like a hollowed-out natural spur, but is very sharp and made of light steel or hawksbill turtle shell.

Gaffs tend to cause puncture wounds. In contrast, slashers tend to lay the bird open, causing more visible injuries and more profuse bleeding. Sakach examined photographs of roosters found at the scene and opined that they showed "laid-open" wounds consistent with those inflicted by cockfighting with slashers. He also identified implements found at the barn as Filipino slashers and a Mexican slasher. There were no gaffs or postizas found at the scene.

In the weeks leading up to a cockfight, the birds are typically put through a rigorous training, exercise and conditioning program called a "keep." Roosters are sparred against each other using so-called sparring muffs. The muffs are made of leather or vinyl, resemble miniature boxing gloves, and fit over a rooster's natural spurs. The muffs can be weighted so that the birds increase their strength by sparring.

Sparring helps determine the birds' aggressiveness, and also gets the birds used to being handled and facing other birds. Sometimes, instead of having roosters fight with muffs, a "cull cock" or "junk" bird is swung in front of the rooster being trained so that it learns to attack a bird coming at it above ground. Immediately before a fight, cockfighters often withhold water from the birds to reduce bleeding.

Normal barnyard roosters will fight each other, but generally not to the death because the younger bird will quit. Gamecocks are specially bred to be highly aggressive. Thus, gamecocks will fight much longer than other birds will, and that can lead them to acquire severe injuries. Because some gamecocks will try to quit and run, they are fought in a pit to prevent escape.

Sakach testified that cockfighting causes the birds to experience and manifest stress, pain, and suffering. Many signs of pain are very obvious, such as when cuts and wounds are present, but signs of stress may be more subtle. The birds may ruffle their feathers, partly or completely close their eyes, refuse food, favor the injured part of the body, and exhibit lassitude.

The July 26, 1997, cockfights involved here occurred late in the cockfighting season, in the hotter months when birds are going through a periodic molt and are less active. Fights at that point in the season typically involve birds that participants want to cull from their flocks, such as "blinkers," i.e., birds that were blinded in one eye earlier in the fighting season. It is not uncommon to get rid of those birds in a blood-fest.

DISCUSSION

*A. Roosters and Other Birds Are Protected by the Animal Cruelty Statutes*

*1. The Ordinary Meaning of Section 599b Controls*

When interpreting a statute, our fundamental concern is with legislative intent. (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) To determine intent, we begin with the

words of the statute itself. (*Ibid.*) "[W]e turn first to the language of the statute, giving the words their ordinary meaning." (*People v. Birkett* (1999) 21 Cal.4th 226, 231 [87 Cal.Rptr.2d 205, 980 P.2d 912].) When the language is clear, we need not resort to other indicia of legislative intent. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

 Defendants appeal their respective felony convictions under section 597, subdivisions (a) and (b).[2] Their main argument is that the word "animal" as used in the animal cruelty statutes does not apply to roosters injured or killed in cockfighting.[3] We reject defendants' argument. Applying the ordinary meaning of the applicable statutory definition, we conclude that the word "animal," as it is used in section 597, subdivisions (a) and (b), unambiguously includes a rooster or other bird.

A violation of subdivision (a) or (b) is punishable either as a felony or a misdemeanor. (§ 597, subds. (a), (b).) Section 597 is found in title XIV of part I of the Penal Code, under the heading Malicious Mischief. Title XIV is comprised of sections 594 through 625c.[4] Section 599b thereof provides: "In this title the word 'animal' includes *every dumb creature* . . . ." (Italics added.) Thus, something is an "animal" for purposes of section 597, subdivisions (a) and (b) if it falls within the category, "every dumb creature." We conclude that a rooster or other bird is encompassed by this broad definition of "animal."

In relevant part, Webster's Third New International Dictionary (1993) at page 700 defines the word "dumb" as: "**1:** destitute of the power of speech . . . **2 a:** by nature incapable of speech like that of human beings <~animals> . . . [¶] **syn[onyms]** MUTE, SPEECHLESS, INARTICULATE: DUMB and MUTE are often interchangeable, but some differences may be noted. In reference to animals, MUTE implies an inability to make sounds, DUMB an incapacity for speech . . . ."[5]

As germane here, the same source defines "creature" as follows: "**1:** something whether animate or inanimate regarded as created . . . **2 a:** one of

---

[2]Baniqued does not challenge his four misdemeanor convictions.

[3]In brief, section 597, subdivision (a) makes it illegal to commit various types of cruelty against "a living animal," or to "maliciously and intentionally" kill "an animal." Subdivision (b) of section 597 prohibits cruelty against or the cruel killing of "any animal," subjecting "any animal" to needless suffering or inflicting unnecessary cruelty upon the "animal," or abusing "any animal."

[4]The statutes within title XIV which pertain to animals are found at sections 596 through 600.5.

[5]The "boldface or lightface swung dash [~] stands for the preceding boldface entry word," while the "lightface angle brackets [< >] contain a verbal illustration." (Webster's 3d New Internat. Dict., *supra*, at p. 54a.)

the lower animals . . . ; *esp*[*ecially*]: a farm animal . . . **b:** a human being . . . ." (Webster's 3d New Internat. Dict., *supra*, p. 532.) In pertinent part, "animal" is defined as: "**1:** an organism of the kingdom Animalia . . . being distinguished from typical plants . . . **2 a:** one of the lower animals: a brute or beast as distinguished from man: any creature except a human being . . . **b:** a mammal as distinguished from a bird, reptile or other nonmammal . . . ." (*Id.* at p. 85.)

Thus, in its broadest sense, the phrase "dumb creatures" describes all animals except human beings. The use of the adjective "every" in the definition indicates that a broad meaning was intended. As relevant here, "every" means: "**1 a:** being each individual or part of a class or group whether definite or indefinite in number without exception . . . ." (Webster's 3d New Internat. Dict., *supra*, p. 788.) Accordingly, the plain language of the statute shows that the Legislature did not intend to restrict the phrase to mammals. The category "every dumb creature" plainly includes roosters and other birds.

Section 599b was enacted in 1905, but we are aware of no prior published California decision interpreting the phrase "every dumb creature." (§ 599b.) However, the construction we recognize here is supported by persuasive decisions of courts in other states that have considered the meaning of the phrase.

Each such decision we have uncovered has construed the phrase broadly. (*Wilkerson v. State* (Fla. 1981) 401 So.2d 1110, 1112 [definition of "animal" as " 'every living dumb creature' . . . excludes human beings from the commonly understood definition of animals" and thus animal cruelty statute applies to raccoons]; *Waters v. People* (1896) 23 Colo. 33 [46 P. 112, 113-115] [definition " 'every living dumb creature' " applies to doves used as live targets for trap shooting; opinion also describes birds as "dumb creatures" (46 P. at p. 113) and "dumb animals" (*id.* at p. 114)]; *State v. Kirchner* (1984) 19 Ohio Misc.2d 7 [483 N.E.2d 497, 499] [definition of "animal" as " 'every living dumb creature' . . . would obviously include a snake . . . ."].)

We hold that the word "animal," as used in section 597, subdivisions (a) and (b), and as expressly defined in section 599b, includes roosters and other

birds.[6] The fact that the roosters involved in a particular case are used or intended to be used in cockfighting is of no consequence.[7]

### 2. *Jett v. Municipal Court Is Inapposite*

Defendants' argument that the term "animal" refers only to mammals relies on *Jett v. Municipal Court* (1986) 177 Cal.App.3d 664 [223 Cal.Rptr. 111] (*Jett*), a decision of the Fourth Appellate District, Division One. Defendants' reliance on *Jett* is misplaced for various reasons.

*Jett* involved a 50-year-old giant tortoise named Rocky, which was owned by the defendant and kept at a petting zoo at a shopping center. (*Jett, supra,* 177 Cal.App.3d at p. 666.) The humane society found the tortoise was suffering from various physical ailments indicating a lack of care and attention, and therefore removed the tortoise from the defendant's custody. (*Ibid.*)

The municipal court convicted Jett of misdemeanor violations of section 597, subdivision (b), for subjecting an animal to needless suffering, and section 597f, for permitting an animal to be on a street or lot without proper care and attention. (*Jett, supra,* 177 Cal.App.3d at pp. 666-667.) The court fined the defendant, ordered him to relinquish ownership of the tortoise to Mesa College subject to the humane society's statutory lien for care provided to the tortoise (§ 597f, subd. (a)), and denied the defendant's request that the tortoise be returned to him. (177 Cal.App.3d at p. 667.)

Defendant Jett then filed a petition for writ of mandate in superior court to compel the municipal court to vacate its order denying his motion for return of the tortoise and to enter an order granting such motion. (*Jett, supra,* 177 Cal.App.3d at p. 667.) The defendant's writ petition was denied, and he then appealed. (*Ibid.*)[8]

The Court of Appeal concluded that the municipal court was without power to divest the defendant of ownership of the tortoise. (*Jett, supra,* 177

---

[6]Because the facts of this case involve roosters, which are birds, we need not and do not decide whether the definition at section 599b, as applicable to section 597, subdivisions (a) and (b), also includes reptiles, amphibians, fish, or other nonmammals.

[7]In part B of our Discussion, *post,* we shall reject defendants' claim that they cannot be convicted of felonies under the animal cruelty statutes because their conduct is covered by assertedly "specific" statutes relating to cockfighting (violations of which are misdemeanors).

[8]In the meantime, the superior court, appellate division, had reversed defendant's criminal convictions. (*Jett, supra,* 177 Cal.App.3d at p. 667 & fn. 3.) The Court of Appeal found that the nonstatutory motion for return of the tortoise was a proceeding separate from the criminal trial, and that the reversal in the latter did not bar its consideration of the appeal from the denial of the writ petition. (*Ibid.*) The separately concurring justice noted that the issue in the case was "arguably moot." (*Id.* at p. 671 (conc. opn. of Work, Acting P. J.).)

Cal.App.3d at pp. 668, 671.) The court observed that the disposition of animals cruelly treated fell into two categories (*id.* at p. 668), but found that the situation before it fell into neither one (*id.* at p. 669).

The court first observed that statutory liens make animal owners liable for the costs of care provided to impounded animals. (177 Cal.App.3d at pp. 668-669.) In some cases, abandonment might permit the divestment of ownership, but only following the procedures for establishing the lien and its amount. (*Id.* at p. 669.) However, there was no abandonment of the tortoise in *Jett*, because the defendant petitioned for its return and the municipal court had expressly reserved the humane society's lien. (*Ibid.*)

Hence, *Jett* considered the other alternative: whether the defendant could be divested of ownership under statutes pertaining to the forfeiture of "fighting animals." (*Jett, supra,* 177 Cal.App.3d at p. 669.) Section 599aa provides that an officer making an arrest under section 597.5 (fighting dog) *shall,* and that an officer making an arrest under section 597b (fighting "bull, bear, cock, or other animal") or section 599a (search and arrest warrants pertaining to "dumb animals and birds") " '*may* . . . take possession of all birds or animals . . . .' " (177 Cal.App.3d. at p. 669 [citing § 599aa].)[9]

Section 599aa also mandates the forfeiture (and destruction or other disposition) of the seized "birds or animals" upon a defendant's conviction under "any Penal Code section prohibiting specific activities involving fighting birds or animals." (*Jett, supra,* 177 Cal.App.3d at p. 669.) The *Jett* defendant was not convicted of any bird- or animal-fighting offense, however. (*Ibid.*)

Despite this, the People contended that the forfeiture of "fighting animals" provided for by section 599aa authorized the municipal court to award the tortoise to the college. (*Jett, supra,* 177 Cal.App.3d at pp. 669-670.) The Court of Appeal disagreed for the following reasons: "The argument fails. Rocky is not a fighting animal. He is a reptile . . . characterized as long-lived, slow-moving and herbivorous. . . . [¶] It is true for some purposes a tortoise is deemed an animal. Thus, a motion picture exhibiting the intentional killing of, or cruelty to, an animal, may be enjoined as a nuisance. (Civ. Code, § 3505.) For these purposes, the word 'animal' means any amphibian, bird, mammal or reptile, but not a fish or insect. (Civ. Code, § 3504.) 'Animal' in its broadest sense includes any organism of the animal kingdom, one of the three divisions into which natural objects are divided,

---

[9]Although the *Jett* court did not mention it, section 599aa also applies to arrests made pursuant to sections 597c (fighting "bird or animal") and 597j (fighting "cock").

the others being mineral and plant. We conclude the word 'animal' *as used in these Penal Code sections* means a mammal as distinguished from a bird, reptile or other nonmammal. (See Webster's Third New Internat. Dict., *op. cit. supra.*) [¶] This slow-moving, grass-grazing giant tortoise is not a fighting animal." (*Jett, supra,* 177 Cal.App.3d at p. 670, italics added, fn. omitted.)

The immediately preceding quotation shows that the *Jett* court concluded merely that a tortoise does not qualify as a *fighting* animal for purposes of the statutes at issue there, i.e., sections 599aa and 597b. (*Jett, supra,* 177 Cal.App.3d at p. 669.) *Jett* did not purport to, and did not, construe the meaning of "animal" for purposes of section 597, subdivisions (a) and (b), statutes that are not by their terms restricted to fighting animals.[10]

More importantly, however, the *Jett* decision failed to cite section 599b, which expressly and broadly defines "animal," for purposes of title XIV of the Penal Code, to include "every dumb creature . . . ." (§ 599b.) Because *Jett* did not consider the significance of section 599b, *Jett* is not good authority for the proposition that only a mammal is an "animal" for purposes of section 597, subdivisions (a) and (b). *Jett* does not support the view that a tortoise or other nonmammal is not an "animal" as defined by section 599b.

Therefore, *Jett* is properly limited to the conclusion that a tortoise is not a "fighting" animal for purposes of sections 599aa and 597b. (*Jett, supra,* 177 Cal.App.3d at p. 670.) Our belief that *Jett* should be so limited is supported by its closing comment that "[a]bsent statutory authority, a court may not divest an owner of a property interest in a *nonfighting* animal or bird" (*id.* at pp. 670-671, italics added) to effectuate the state's interest in the protection of animals. (*Id.* at p. 670.)[11]

---

[10]Defendants' assertions that *Jett, supra,* 177 Cal.App.3d 664, found a tortoise "was not an animal under Penal Code Sections [*sic*] 597(a) or (b)" and that *Jett* "specifically held that 'animal' in those statues [*sic*] was limited to 'mammals' " are incorrect.

[11]Defendants correctly observe that sections 599aa ("birds or animals") and 599a ("dumb animals or birds") refer to birds and animals in the disjunctive. This does not, however, indicate statutory recognition of the view (discredited herein) that *Jett* distinguished between birds and mammals for purposes of section 597, subdivisions (a) and (b). As stated in the text, we are construing sections 599b and 597, subdivisions (a) and (b), not sections 599aa and 599a. The use of the disjunctive in certain statutes does not mean birds are outside the definition of "animal"—which includes "every dumb creature" (§ 599b)—for purposes of section 597, subdivisions (a) and (b), which do not distinguish between birds and animals, but rather use only the term "animal." Further, we note that section 597b applies to "any bull, bear, *cock, or other animal*" and proscribes fighting between the listed life forms and a "*like*

### 3. *Other Supposed Indicia of Legislative Intent Support the View That a Rooster Is an "Animal"*

Defendants contend that certain conduct (including inaction) by the Legislature indicates its intent that roosters are not "animals" for purposes of the animal cruelty statutes. Because we have already found that the language of section 599b is unambiguous, we need look no further to deduce the legislative intent. (*Lungren v. Deukmejian, supra,* 45 Cal.3d at p. 735.)

However, in light of the importance of the issue presented, we shall examine defendants' assertions. We find that the legislative history on which defendants rely provides further, albeit unnecessary, confirmation of our conclusion that a rooster or other bird qualifies as an "animal" for purposes of section 597, subdivisions (a) and (b).

### a. *1987 amendments to section 597*

Defendants first contend that soon after the 1986 decision in *Jett, supra,* 177 Cal.App.3d 664, the Legislature responded by adding subdivision (f) to section 597. In relevant part, subdivision (f) provides that when a person is convicted under section 597 of "an act of cruelty, as defined in Section 599b, all animals lawfully seized and impounded . . . shall be . . . forfeited . . . ." (§ 597, subd. (f)(1).)

Based on this, defendants claim: "If the [L]egislature disagreed with the *Jett* decision as to the meaning of 'animal' within subsections [*sic*] (a) and (b) it certainly could have made its views clear. The absence of any change in that definition while the Legislature was specifically responding to *Jett* by adding subsection [*sic*] (f)" assertedly showed that the Legislature agreed with *Jett* in that respect.

Defendants' argument fails because it starts from a false premise. As we have seen, *Jett, supra,* 177 Cal.App.3d 664, stands only for the proposition that a tortoise is not a *fighting* animal under sections 599aa and 597b. (177 Cal.App.3d at p. 670.) Since *Jett* did not decide what is an "animal" for purposes of section 597, subdivisions (a) and (b), the Legislature had no occasion impliedly to agree or disagree with *Jett* on that subject.

Also, because *Jett, supra,* 177 Cal.App.3d 664, failed to mention section 599b, we will not assume that the Legislature's *inaction* constituted an

---

kind of animal or creature . . . ." (Italics added.) Thus, defendants' position fails under their own logic.

implied ratification of a narrow construction of the phrase "every dumb creature." (§ 599b.) Finally, new subdivision (f) was added to section 597, the same statute containing the animal cruelty statutes at subdivisions (a) and (b). Thus, if defendants' reasoning were correct, it would be just as valid to say that the Legislature intended that cruelty to tortoises—which, like birds, are not mammals—be punishable as a misdemeanor *or felony* under section 597, subdivisions (a) and (b).

By adding subdivision (f) to section 597, the Legislature intended to provide for the forfeiture of *nonfighting* animals which are cruelly treated, in that respect abrogating *Jett, supra,* 177 Cal.App.3d 664. There is no indication that in doing so the Legislature also intended to exempt tortoises or other nonmammals from the broad definition of "animal" expressed at section 599b.

### b. *1984 amendments to section 597*

Defendants also point out that in 1984 the Legislature added subdivisions (c), (d) and (e) to section 597. Subdivision (c) makes it a felony or misdemeanor to maliciously and intentionally maim, mutilate, or torture "any mammal, bird, reptile, amphibian, or fish" described in subdivision (d). Subdivision (d) states that subdivision (c) "applies to any mammal, bird, reptile, amphibian, or fish which is a creature described as follows," i.e., endangered or threatened species, and "[f]ully protected" birds, mammals, reptiles, amphibians, and fish, as described in various provisions of the Fish and Game Code. (§ 597, subd. (d)(1)-(5).) Subdivision (e) makes each act of maiming, mutilating, or torturing "a separate specimen of a creature described in subdivision (d)" a separate offense.

Defendants assert that the addition of subdivisions (c), (d) and (e), "in which the word animal is not used but a much broader set of creatures is described[] is strong support for the view that the *Jett* definition of 'animal' was not in conflict with the view of the [L]egislature with respect to creatures not covered by subsections [*sic*] (c), (d) and (e) of Section 597."

However, that argument suffers from the same fallacy noted above, i.e., the erroneous view that *Jett, supra,* 177 Cal.App.3d 664, decided what constitutes an "animal" for purposes of section 597, subdivisions (a) and (b). In addition, defendants are mistaken in suggesting that subdivision (d) describes "a much broader set of creatures." In fact, the group of creatures incorporated by reference to the Fish and Game Code is quite circumscribed.

(§ 597, subd. (d)(1)-(5), citing Fish & G. Code, §§ 2050 et seq., 3511, 4700 et seq., 5050 et seq., 5515.)[12]

The plain language of section 597, subdivisions (c), (d) and (e), evinces a far-ranging intent to punish cruelty against "every dumb creature" (§ 599b), even when the creatures involved are certain wild mammals, birds, reptiles, amphibians, or fish.[13] Subdivision (e) also signifies an intent to punish more severely cruelty against endangered, threatened and protected species by making each cruel act against "a separate specimen of a creature" a separate offense. (§ 597, subd. (e).) This does not mean the Legislature did not also intend to punish as a felony, under subdivisions (a) and (b), cruelty against roosters and other birds outside the scope of subdivision (d).

In addition, section 597, subdivisions (d) and (e) use the term "creature" in reference to mammals, birds, reptiles, amphibians, and fish. This supports our conclusion that section 599b, defining an "animal" as including "every dumb creature," includes roosters and other birds, and not only mammals.

Finally, we reject defendants' implication that the only birds (or other nonmammals) protected under section 597 are the endangered, threatened or protected species described in subdivision (d). (§ 597, subd. (d)(1)-(2), (4)-(5).) If that were the case, then there would be no need for subdivision (d) also to describe certain mammals (§ 597, subd. (d)(3)), since defendants readily admit—and no one would dispute—that a mammal qualifies as an "animal" under subdivisions (a) and (b). In other words, to accept such an argument would be to say that not even mammals are within the scope of

---

[12]Fish and Game Code section 2050 et seq. is the California Endangered Species Act, which applies only to "[c]ertain species of fish, wildlife, and plants" (*id.*, § 2051, subd. (a)) appearing on a list of endangered and threatened species established by the Fish and Game Commission (*id.*, § 2070). The list currently includes 47 endangered and 29 threatened species of animal. (Cal. Code Regs., tit. 14, § 670.5.) Fish and Game Code section 3511 lists 13 species of "fully protected birds." Fish and Game Code section 4700 lists nine species of "fully protected mammals." Fish and Game Code section 5050 lists five species of "fully protected reptiles and amphibians." Fish and Game Code section 5515 lists 10 species of "fully protected fish." The endangered and threatened species list overlaps to some extent with the lists of fully protected birds, mammals, reptiles, amphibians and fish.

[13]At the time subdivisions (c), (d) and (e) were added to section 597, cruelty was punishable under subdivision (a) only if the animal was the "property of another." (Stats. 1979, ch. 373, § 240, p. 1350.) Further, violation of subdivision (b) was still only a misdemeanor. (*Ibid.*) The new subdivisions were intended in part to allow felony punishment for cruelty against wild "species that are not the property of another." (Assem. Com. on Crim. Law and Public Saf., Rep. on Sen. Bill No. 1611 (1983-1984 Reg. Sess.) as amended June 12, 1984, p. 2.) Subdivision (a) was later amended to apply also to an animal "which is the property of the person" (Stats. 1987, ch. 814, § 1, p. 2532), and amended again to delete the limiting language "which is the property of the person or the property of another." (Stats. 1988, ch. 1522, § 1, p. 5410.) Soon thereafter, subdivision (b) was amended to permit *felony* punishment. (Stats. 1988, ch. 1527, § 1, p. 5427.)

subdivisions (a) and (b), an untenable interpretation. The argument also fails with respect to roosters and other birds.

### c. *1989 rejection of Senate Bill No. 1587*

Defendants also rely on the fact that the Legislature rejected Senate Bill No. 1587 (1989-1990 Reg. Sess.), introduced on March 10, 1989, which sought to make cockfighting punishable as either a misdemeanor or a felony. Defendants claim "there would have been no reason to make cock fighting a felony if the killing, maiming or mutilation of roosters was covered by Penal Code Sections 597(a) or 597(b) [*sic*]."

Preliminarily, we note that neither at the trial court nor on appeal did the defendants request judicial notice of Senate Bill No. 1587 and related legislative materials. As a result, those matters are not in the appellate record and defendants may have waived reliance thereon. (Evid. Code, § 459, subds. (a), (b).) Thus, there are sufficient reasons simply not to consider the argument here. However, we choose to address the argument on its merits. (Evid. Code, § 454, subd. (a)(1).)

■ As evidence of legislative intent, unpassed bills are of little value (*Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 990-991, fn. 7 [9 Cal.Rptr.2d 102, 831 P.2d 327]) and arguably irrelevant. ■ We are not persuaded that the failure of Senate Bill No. 1587 shows the Legislature intended to preclude a felony prosecution for cruelty to roosters.

Senate Bill No. 1587 may have failed for any number of reasons unrelated to the legislative intent regarding whether a rooster is an "animal" for purposes of section 597, subdivisions (a) and (b). For all anyone knows, it failed because the Legislature believed that cruelty to roosters used in or intended for cockfighting was already punishable as a felony under section 597, subdivisions (a) and (b). We decline to speculate on these matters.

Finally, Senate Bill No. 1587 sought to amend sections 597b, 597c, 597e, 597i, 597j and 599aa (Sen. Bill No. 1587 (1989-1990 Reg. Sess.) §§ 1-5, 7), which are *not* the statutes at issue here. The pertinent statutes are section 599b and section 597, subdivisions (a) and (b). As will appear from part B of our Discussion, *post*, Senate Bill No. 1587 sought to address crimes distinct from those covered by section 597, subdivisions (a) and (b). Legislative action or inaction in elevating the punishment available under those other laws—for various types of conduct which may not involve cruelty—is not logically connected to section 597, subdivisions (a) and (b), which permit felony punishment for cruelty to roosters and other birds.

## B. *General v. Specific Statutes*

Defendants' final argument is that the existence of supposedly "specific" legislation dealing with cockfighting precludes defendants' prosecution under the more "general" animal cruelty statutes—section 597, subdivisions (a) and (b)—for the criminal conduct involved here.[14]

First we observe that defendants may have waived this claim on appeal. Their opening brief suggested that "the specific legislation dealing with cockfighting should limit the application of the more general law contained in Penal Code Section 597(a) and (b) . . . ." ▮ However, defendants failed to cite any authority, present any legal analysis, or place the argument under a separate heading, arguably waiving the point. (*Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72]; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4 [41 Cal.Rptr.2d 263]; *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)

▮ Defendants make the same argument in their reply brief, and at least cite some authority there. ▮ Withholding a point until the reply brief deprives the respondent of an opportunity to answer it, however.[15] Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to present it before. (*People v. Speegle* (1997) 53 Cal.App.4th 1405, 1418, fn. 8 [62 Cal.Rptr.2d 384]; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 616, pp. 647-648.) No good cause is shown here. In any event, defendants' position is untenable.

▮ "The principle that a specific statute prevails over a general one applies only when the two sections cannot be reconciled." (*People v. Wheeler* (1992) 4 Cal.4th 284, 293 [14 Cal.Rptr.2d 418, 841 P.2d 938], citing, inter alia, Code Civ. Proc., § 1859.) "In the construction of a statute the intention of the Legislature . . . is to be pursued, if possible; and when a general and [a] particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it." (Code Civ. Proc., § 1859.)

Thus, prosecution under the general statute is forbidden if the specific statute covers much of the same subject, so that violation of the specific will

---

[14]Defendants do not identify the supposed prevailing "specific" statute or statutes. Presumably, however, they mean sections 597b and 597c, and perhaps sections 597i and 597j. Defendant Baniqued was convicted of misdemeanors under sections 597b, 597c, 597i and 597j.

[15]Because defendants did not raise the argument properly in their opening brief, the People's brief understandably did not respond to it.

necessarily violate the general. (*People v. Sanchez* (1994) 27 Cal.App.4th 918, 922 [33 Cal.Rptr.2d 155].) The special statute supersedes the general only when each element of the general statute corresponds to an element on the face of the specific statute. (*Ibid.*)[16]

■ The principle that the specific prevails over the general does not apply here. The asserted "general" statutes—section 597, subdivisions (a) and (b)—cover different subjects than the supposed "specific" sections 597b, 597c, 597i and 597j. The general and the specific are not inconsistent, but are easily reconciled. Further, each element of the general does not correspond to an element of the specific. Thus, violation of the specific statutes would not necessarily violate the general.

An examination of the statutes illustrates the point. Section 597b prohibits fighting any bull, bear, cock, or other animal, not including a dog, with a like kind of animal or creature; fighting any such animal, including a dog, with a different kind of animal or creature or a human being; worrying or injuring any such bull, bear, cock, dog or other animal, or causing any such bull, bear, cock, or other animal, not including a dog, to worry or injure each other; permitting the same to be done on any premises under defendant's charge or control; and aiding, abetting, or being present as a spectator at such fighting or worrying of such animal or creature.[17]

Violating section 597b would not necessarily violate section 597, subdivision (a) or (b). Subdivision (a) proscribes maliciously and intentionally maiming, mutilating, torturing, or wounding a living animal, or maliciously and intentionally killing an animal.[18] Subdivision (b) forbids overdriving,

---

[16]Since the principle advanced by defendants applies only if violation of the specific will necessarily violate the general (*People v. Sanchez, supra,* 27 Cal.App.4th at p. 922), defendants impliedly concede that the assertedly general animal cruelty statutes—section 597, subdivisions (a) and (b)—apply to roosters, thereby contradicting their main argument on appeal.

[17]The full text of section 597b is as follows: "Any person who, for amusement or gain, causes any bull, bear, cock, or other animal, not including any dog, to fight with like kind of animal or creature, or causes any such animal, including any dog, to fight with a different kind of animal or creature, or with any human being; or who, for amusement or gain, worries or injures any such bull, bear, cock, dog or other animal, or causes any such bull, bear, cock, or other animal, not including any dog, to worry or injure each other; and any person who permits the same to be done on any premises under his charge or control; and any person who aids, abets, or is present at such fighting or worrying of such animal or creature, as a spectator, is guilty of a misdemeanor."

[18]Section 597, subdivision (a) provides: "(a) Except as provided in subdivision (c) of this section or Section 599c, every person who maliciously and intentionally maims, mutilates, tortures, or wounds a living animal, or maliciously and intentionally kills an animal, is guilty

overloading, driving when overloaded, overworking, torturing, tormenting, depriving of food, drink, or shelter, cruelly beating, mutilating, or cruelly killing any animal, or causing or procuring the same; and subjecting any animal to needless suffering, or inflicting unnecessary cruelty upon the animal, or in any manner abusing any animal.[19]

As relevant to cockfighting, a person might cause roosters to fight each other without necessarily inflicting the types of cruelty prohibited by section 597, subdivision (a) or (b). For example, roosters might be made to fight each other—in violation of section 597b—under conditions that might not violate the "general" statutes, such as with protective sparring muffs; or without gaffs, slashers, or other implements; or without using cocks specially bred for aggressiveness; or for only an extremely short period of time; or under other such conditions.[20]

Defendants' argument under the other supposed "specific" statutes is even weaker. Section 597c makes it a crime to own, possess, keep, or train any bird or animal intended to be used in fighting, or to be present at such a fight.[21] Section 597j criminalizes owning, possessing, or keeping a cock with

---

of an offense punishable by imprisonment in the state prison, or by a fine of not more than twenty thousand dollars ($20,000), or by both the fine and imprisonment, or, alternatively, by imprisonment in a county jail for not more than one year, or by a fine of not more than twenty thousand dollars ($20,000), or by both the fine and imprisonment."

[19]Section 597, subdivision (b) provides: "(b) Except as otherwise provided in subdivision (a) or (c), every person who overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, drink, or shelter, cruelly beats, mutilates, or cruelly kills any animal, or causes or procures any animal to be so overdriven, overloaded, driven when overloaded, overworked, tortured, tormented, deprived of necessary sustenance, drink, shelter, or to be cruelly beaten, mutilated, or cruelly killed; and whoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, or fails to provide the animal with proper food, drink, or shelter or protection from the weather, or who drives, rides, or otherwise uses the animal when unfit for labor, is, for every such offense, guilty of a crime punishable as a misdemeanor or as a felony or alternatively punishable as a misdemeanor or a felony and by a fine of not more than twenty thousand dollars ($20,000)."

[20]We in no way intend to suggest that fighting roosters under any of the conditions mentioned as examples here would always preclude prosecution under section 597, subdivision (a) or (b). Although fighting roosters under the conditions mentioned may not *necessarily* result in a violation of section 597, subdivision (a) or (b), such a violation could occur under the circumstances of a particular case. We need not address all the possible scenarios here.

[21]"Whoever owns, possesses, keeps, or trains any bird or animal, with the intent that such bird or animal shall be engaged in an exhibition of fighting, or is present at any place, building, or tenement, where preparations are being made for an exhibition of the fighting of birds or animals, with the intent to be present at such exhibition, or is present at such exhibition, is guilty of a misdemeanor. This section shall not apply to an exhibition of fighting of a dog with another dog." (§ 597c.)

the intent that it be used in fighting.[22] Plainly, it is possible to violate sections 597c and 597j without violating section 597, subdivision (a) or (b).

Finally, section 597i makes it illegal to make, buy, sell or possess gaffs, slashers, and similar implements used in cockfighting.[23] A person certainly can violate section 597i without violating either subdivision (a) or (b) of section 597.

Hence, we reject defendants' claim that specific statutes punishing various crimes as misdemeanors preclude defendants' prosecutions and convictions for felonies under the animal cruelty statutes. █ When we interpret statutes, "[w]e must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].)

█ Sections 597b, 597c, 597i, and 597j each address conduct which is less egregious than the conduct proscribed by section 597, subdivisions (a) and (b). The legislative intent underlying this statutory scheme is to punish less despicable conduct less severely, and to punish more despicable conduct more severely. Thus, for example, a person may be convicted of a misdemeanor under section 597b for cockfighting and associated activities even absent cruelty to the rooster.

If, however—as here—such activity in a particular case involves the malicious and intentional maiming, mutilating, torturing, or wounding of roosters, the subjection of roosters to needless suffering, the cruel killing of roosters, or some other violation of the animal cruelty statutes, then the person is properly convicted of either a misdemeanor *or a felony*. (§ 597, subds. (a), (b).)

To adopt defendants' view of the statutory scheme would create an absurd situation that would allow a person to inflict the most heinous cruelty upon roosters with relative impunity, all under the guise that such conduct is

---

[22]Section 597j states, in its entirety: "Any person who owns, possesses or keeps any cock with the intent that such cock shall be used or engaged by himself or by his vendee or by any other person in any exhibition of fighting is guilty of a misdemeanor."

[23]"It shall be unlawful for anyone to manufacture, buy, sell, barter, exchange, or have in his possession any of the implements commonly known as gaffs or slashers, or any other sharp implement designed to be attached in place of the natural spur of a gamecock or other fighting bird. Anyone violating any of the provisions of this section shall be guilty of a misdemeanor and upon conviction thereof shall, in addition to any judgment or sentence imposed by the court, forfeit possession or ownership of such implements." (§ 597i.)

subject to punishment only under the misdemeanor statutes relating to cockfighting and associated activities. We decline to embrace such an erroneous interpretation of the law.

## DISPOSITION

The judgments are affirmed.

Callahan, J., and Hull, J., concurred.