Filed 8/29/13  In re S.S. CA2/6
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re S. S., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B244580 (Super. Ct. No. JV49815) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,    Plaintiff and Respondent, v. JEREMY S. et al.,    Defendants and Appellants. | |

Jeremy S. (father) and Sherry P., paternal grandmother, (Sherry) appeal from the juvenile court's orders denying Sherry's Welfare and Institutions Code section 388[1] petition asking the court to place S.S., the minor child, with her.  Father also appeals from the order terminating his parental rights to his daughter, S.S.[2]  Father and Sherry

_____

[1] All further statutory citations are to the Welfare and Institutions Code, unless otherwise stated.

[2] The court also terminated the parental rights of A. G. (mother) who is not a party to this appeal.  S.S.'s other relatives include maternal grandmother, Tammy G. (A.'s mother), and maternal great-grandmother Angela W. (mother's paternal grandmother), who is married to John W.

contend the court abused its discretion by denying Sherry's section 388 petition. Father also contends the juvenile court erred by finding that the San Luis Obispo County Department of Social Services (department) complied with the notice requirements of the Indian Child Welfare (ICWA), 25 United States Code, sections 1901 et seq., and concluding that ICWA does not apply. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Father and A. G. (mother) have three children. This case concerns S.S., their youngest child. In February, 2011, ten-week old S.S. was living with parents in San Luis Obispo County. Her six-year old brother, Marsel, and five-year old sister, I., were living in Atascadero, with paternal grandmother Sherry P. (Sherry), their legal guardian, and her husband, Thomas P. (Tom). In 2005, when M. was an infant, authorities in North Carolina removed him from parents' home because of "ongoing domestic violence." I. was placed with Sherry shortly after her birth.

The department filed a petition on March 1, 2011, alleging parents failed to protect and support S.S. (§ 300, subds. (b), (g).) On February 26, 2011, the police arrested mother for inflicting corporal injury on a spouse and disturbing the peace (Pen. Code, §§ 273.5, subd. (a); 415), and the department took S.S. into protective custody. The petition and detention report describe the parents' "history of alcohol induced violent interactions," their inability to care for M. and I., and mother's severe depression.

Mother and father told the department they wanted S.S. to be placed with Sherry. Mother did not have contact with her mother, Tammy G. Maura Hugh, a department social worker, spoke with Sherry about possibly placing S.S. with her. Sherry said she already had custody of M. and I., and did "not feel she [could] take care of another child, especially an infant." Accordingly, the April 6, 2011, jurisdictional and dispositional report stated S.S. could not be placed with Sherry. It also stated the most appropriate concurrent plan for S.S. would be placement with maternal great-grandmother (mother's paternal grandparents) Angela W. and her husband, John (Angela and John) in North Carolina. Pending the department's approval of their home, S.S.

2

remained in foster care in San Luis Obispo County. On April 6, the juvenile court declared S.S. to be a dependent child, adopted the proposed plans, and ordered reunification services and visitation for both parents.

In its April 4, 2012, 12-month review report, the department recommended termination of parents' reunification services, based on their poor compliance with their plans. On May 8, 2012, the juvenile court conducted a contested 12- month hearing and ordered that reunification services be terminated.

On June 8, 2012, police arrested father for spousal abuse and false imprisonment. (Pen. Code, §§ 273.5; 236.) He told arresting officers he grabbed mother by her hair, threw her on the bed, got on top of her, and put his knee on her chest. She suffered a black eye and a lip injury.

The department's August 29, 2012, section 366.26 report recommended that the court terminate mother's and father's parental rights, and select adoption as the permanent plan for S.S. In an October 1, 2012, addendum, the department recommended that the court approve the adoption of S.S. by maternal great-grandmother, Angela, and her husband, John. Angela and John are retirees who have been married for the last 12 years. They each have three adult children from prior relationships. They enjoy young children and care for a four-year-old granddaughter several days a week. They understand the obligations of adoption and are committed to adopting S.S. Angela and John flew to San Luis Obispo in July 2012, to visit with S.S. for four days and became acquainted with her. S.S. enjoyed them, responded well to them, and asked to go "bye bye" with them, at the end of their visit.

Mother moved to North Carolina in July 2012. In September 2012, she submitted to the recommendation for termination of her parental rights.

On September 13, 2012, Sherry filed a petition for de facto parent status and a section 388 petition, asking the court to place S.S. with Sherry. The court granted her de facto parent status and set a combined contested hearing to consider the section 388 petition and the permanent plan for S.S.

3

In October 2012, during the combined hearing, social worker Lori Hunsted testified that S.S. had been in the same foster home since she was 10 weeks old. While in foster care, S.S. had infrequent visits with M. and I. that lasted "from . . . 15 minutes to an hour." Hunsted opined that S.S. and her siblings had a connection and enjoyed playing together. She did not believe breaking that connection would traumatize S.S. significantly or impact her ability to "sustain and develop relationships with other children and family members."

Hunsted expressed concern about placing S.S. with Sherry, who has a "long history" of being overwhelmed with caring for two other children, including one with special needs. In addition, the stress of caring for them could increase when they became teenagers. Hunsted further testified that Sherry and Tom had allowed father to "come in and out of their household," which could "create some potential issues" because of father's erratic behavior. She thought that their difficulty in maintaining healthy boundaries with father might pose a risk to S.S. In 2008, on Christmas Eve at Sherry's home, father injured Tom in the presence of M. and I. The court issued an order prohibiting father's having contact with Tom. While that order was still in force, Tom and Sherry permitted father to live in their driveway, in a mobile home, for several months. Hunstad had no doubt that Angela and John could maintain healthy boundaries with their adult children. When mother failed to follow their rules while living in their home, they insisted that she leave.

Social worker Maura Hugh testified that shortly after the department took S.S. into protective custody, she spoke with Sherry about placing S.S. in her home. Sherry explained that M. was "very difficult to deal with," and required services for autism. Sherry said she could not "take on another child" in addition to M. and I. She canceled several scheduled "visits [with S.S.] because of her busy schedule." Hugh supervised visits between S.S. and her family from late 2011, through May 2012. There was little interaction between S.S. and her siblings.

4

Sherry testified that mother and S.S. lived in Sherry's home for about four weeks, shortly after S.S. was born. In 2011, when the department first asked about placing S.S. with her, Sherry did not agree because she did not want to interfere with the bond between mother and S.S. Tom provided similar testimony, and described their hope that S.S. would reunify with parents. Sherry also testified that when S.S. was in foster care, she visited once or twice a month, for 20-60 minutes. During those visits, S.S. sought out M. and I., and was very affectionate toward them.

Sherry further testified that upon learning S.S. would not be reunified with her parents, she contacted Hunsted in May 2012, to request that S.S. be placed with her. She worried that S.S. was too active for Angela and John, and that Angela's adult son would soon be released from prison. In contrast, Hunsted reported a May 24, 2012, conversation with Sherry about the plan to place S.S. with Angela and John. She told Hunstad they "were 'a nice Christian family' and she was not worried about them."

Father testified that he objected to S.S.'s placement with Angela in North Carolina, with mother living in North Carolina. Angela previously told mother and father that if she gained custody of S.S., she would return her to mother. Father also worried that Angela's adult son would be released from prison soon. Further, S.S. had a bond with her siblings and sought their company.

The attorney for S.S. stated that it was in S.S.'s best interests to be placed with Angela and John. She cited "all the reports [describing how Sherry] felt exhausted [caring for M. and I.]; felt like giving up; felt like sending one of the kids to North Carolina . . . [and said it] would be extremely difficult [for them] to take on another child." S.S.'s attorney noted the serious boundary problems that posed a risk to S.S. She referred to evidence that the restraining order barring father's contact with Tom also protected M. and I. Despite that, Tom and Sherry allowed father to stay in their driveway for about a year, while the order was in effect, and while S.S. was a dependent child.

The juvenile court terminated parental rights, identified adoption as the permanent plan for S.S., and found that the sibling relationship exception did not apply.

Before ruling on the section 388 petition, the court cited father's violent behavior toward Tom in the presence of M. and I.; the apparent difficulty Sherry and Tom had in maintaining a healthy boundary with father; the documented "long history . . . [that Sherry] was overwhelmed taking care of the special needs child, M. [and I.]; . . . and [Sherry's earlier opinion that] bringing a third child into the family could upset the equilibrium." The court concluded that it was not in the best interests of S.S. to place her with Sherry, and denied her petition.

## DISCUSSION

### *Section 388 Petition*

Sherry and father contend that the juvenile court abused its discretion by denying her section 388 petition requesting that S.S. be placed with her.[3] We disagree.

"Section 388 allows a . . . person with an interest in a dependent child to petition the juvenile court to change, modify, or set aside any previous order. (§ 388, subd. (a).)" (*In re Mickel O*. (2011) 197 Cal.App.4th 586, 615.) "The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances and (2) that the proposed modification would be in the best interests of the child." *(Ibid.)*

"We review the juvenile court's denial of a section 388 petition for an abuse of discretion. [Citation.] The court 'exceeds the limits of legal discretion by making an arbitrary, capricious or patently absurd determination.' [Citation.] The test for abuse of discretion is whether the court exceeded the bounds of reason. '"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two

---

[3] Citing *In re K.C.* (2011) 52 Cal.4th 231, respondent contends that father lacks standing to challenge the section 388 placement ruling because father raised no issue on appeal that would be advanced by the reversal of the placement order. "A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights." (*Id*. at p. 238.) The ICWA issue that father raised in his opening brief to challenge such termination would not be advanced by the reversal of the placement order. However, for purposes of discussion, we assume father has standing.

or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citation.]'" (*In re Mickel O.*, *supra,* 197 Cal.App.4th at p. 616.)

In her section 388 petition, Sherry sought a change in the proposed plan for S.S. to be adopted by Angela and John in North Carolina. Before selecting the permanent plan for S.S., the juvenile court provided Sherry the opportunity to present evidence to establish that it would be in the best interests of S.S. to order her placement with Sherry. (§ 388, subd. (b) [Any person may petition the court to request placement with the dependent child, or consideration when determining or implementing a permanent plan for the dependent child or make any other request for an order which may be shown to be in the best interest of the dependent child].)

The juvenile court's decision to deny Sherry's petition was not arbitrary, capricious or beyond the bounds of reason. The court's goal was to promote the children's best interests, which at that point were permanency and stability. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.) The court was required to assess conflicting evidence concerning critical factors, including Sherry's commitment to have S.S. placed in her home, despite her history of feeling overwhelmed while caring for two other grandchildren, including one with special needs; the apparently limited ability of Sherry and Tom to establish safe boundaries with father, despite an outstanding restraining order barring his contact with Tom; and father's ongoing history of violent episodes, including the June, 2012, incident in which he injured mother. Based on that evidence, the court reasonably concluded that placing S.S. with Sherry was not in her best interests. "It is the [juvenile] court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.]" (*In re Casey D*. (1999) 70 Cal.App.4th 38, 52-53.) The court did not abuse its discretion by denying Sherry's petition.

7

We reject Sherry's claim that "even if the juvenile court did not deem it to necessarily be appropriate to place S.S. with [Sherry], there was still a valid request for a court order prevent [her] removal from California and placement [with Angela and John] in North Carolina."

In his reply brief, father argues that the section 366.26, subdivision (c)(1)(E), "sibling exception to adoption precludes termination of parental rights over" S.S. Sherry's brief refers to the relationship of S.S. with "her siblings and family." Because neither party properly raised the sibling exception as a separate issue, we need not address it.[4] Moreover, the issue lacks merit.

The juvenile court reasonably concluded S.S.'s relationship with her siblings did not outweigh the permanency and stability that adoption would provide her. "'[T]he court may reject adoption under this sibling relationship exception only if it finds adoption would be detrimental to the child whose welfare is being considered. It may not prevent a child from being adopted solely because of the effect the adoption may have on a sibling.' [Citation.])" (*In re Hector A*. (2005) 125 Cal.App.4th 783, 791.) S.S. was removed from her parents at the age of 10 weeks. Throughout her dependency, S.S. lived in a foster home and visited her siblings at most for one hour, once or twice a month. The social worker opined that severing their relationship would not cause S.S. significant trauma or impair her ability to form relationships with others.

*ICWA*

Father contends that the first notices sent to the BIA and the federally recognized Cherokee tribes were insufficient to comply with the ICWA. Implicitly acknowledging as much, the department subsequently sought to remedy the error by conducting a further investigation of mother's claims of possible Indian heritage, sending

---

[4] *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 [a point raised for the first time in a reply brief is ordinarily "deemed waived and will not be considered," because its omission from the opening brief deprives the respondent of the opportunity to answer it]; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [reviewing court does not normally consider arguments raised in reply brief].

revised notices to the potentially affected tribes, and filing their responses with the juvenile court. We granted the department's motion to augment the record on appeal to include these proceedings. The augmented record amply supports the court's conclusions that the department gave sufficient notice and that the ICWA does not apply.

The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. (25 U.S. C. § 1901 et seq.) The juvenile court and social services agencies have a duty to inquire at the outset of the proceedings whether a child subject thereto is, or may be, an Indian child. (25 U.S.C. § 1912(a); *In re Desiree F*. (2000) 83 Cal.App.4th 460, 470.) An "Indian child" is one who is either a "member of an Indian tribe or . . . eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) ICWA "notices 'must contain enough information to be meaningful. [Citation.] The notice must include: if known, (1) the Indian child's name, birthplace, and birth date; (2) the name of the tribe in which the Indian child is enrolled or may be eligible for enrollment; (3) names and addresses of the child's parents, grandparents, great grandparents, and other identifying information; and (4) a copy of the dependency petition.' [Citation.]" (*In re Francisco W*. (2006) 139 Cal.App.4th 695, 703.)

We review compliance with the ICWA under the harmless error standard. (*In re E.W.* (2009) 170 Cal.App.4th 396, 402-403.) Notice is sufficient if there is substantial compliance with the applicable provisions of the ICWA. (*In re Christopher I*. (2003) 106 Cal.App.4th 533, 566.)

Father's ICWA claim is premised on the fact that the first ICWA notices lacked vital information to identify maternal grandmother and great grandmother, who may have Cherokee heritage. Specifically, those notices lacked their addresses, birthdates or other similar identifying information. The amended notices, however, include identifying information about maternal grandmother and great grandmother. The tribes responded that S.S. was not a tribe member or eligible for tribal membership. The

9

department submitted the revised notices and responses to the juvenile court, and it correctly found that the revised notices were sufficient, and that the ICWA did not apply.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P.J.


YEGAN, J.


10

Jacqueline Duffy, Judge

Superior Court County of San Luis Obispo

_____

Ernest Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant, Jeremy S.

Nicole Williams for Defendant and Appellant, Sherry P.

Rita L. Neal, San Luis Obispo County Counsel, Leslie H. Kraut, Deputy County Counsel, for Plaintiff and Respondent.