Filed 3/23/21  P. v. Johnson CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. CHRISTOPHER JOHNSON, Defendant and Appellant. | B303373 (Los Angeles County Super. Ct. No. PA060033) |

APPEAL from an order of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Affirmed.

Aron Laub for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., and Allison H. Chung, Deputy Attorneys General for Plaintiff and Respondent.

In 2008, a jury convicted defendant Christopher Johnson of eight counts of second degree robbery and found that he personally used a firearm in the commission of each robbery and discharged a firearm in the commission of four robberies. The court sentenced him to 65 years 4 months in prison.

In March 2019, the Secretary of the California Department of Corrections and Rehabilitation (CDCR) sent a letter to the superior court recommending that defendant be resentenced under Penal Code[1] section 1170, subdivision (d)(1). After a contested hearing, the superior court struck five of the eight firearm enhancements and resentenced defendant to 42 years in prison. Defendant appealed. Because the court did not abuse its discretion in resentencing defendant, we affirm the order.

## FACTUAL AND PROCEDURAL SUMMARY

### A. *2008 Convictions*

On June 16, 2005, defendant entered a liquor store in Glendale a few minutes before the store's 10:00 p.m. closing time. He wore gloves, a ski mask with a single opening around the eyes, and a dark, hooded jacket. Defendant pointed a .380-caliber semiautomatic handgun at M.A., grabbed him by the wrist, and pulled him into a corner. Defendant asked M.A. where the money and safe were, but M.A. did not know. Defendant then told H.H., "This is a holdup." Defendant went to the employee's side of the checkout counter and demanded that H.H. open the cash register. When H.H. did not comply, defendant put the gun against H.H.'s temple and repeated his demand. Defendant repeatedly said, "Give me money," and "[g]ive me hundreds." Defendant fired the gun at the floor near H.H.'s foot. H.H. opened the cash register,

---

[1] Subsequent unspecified statutory references are to the Penal Code.

and defendant took the money from it.  Defendant then demanded, "Give me the large monies, give me large dollars," and asked for the location of the safe.  H.H. showed defendant the safe, but defendant left without opening it.

On the night of January 5, 2006, defendant entered a market in Canyon Country near closing time.  He wore a black jacket, dark gloves and a black or dark ski mask with one opening for the eyes.  He leaped over the counter and crouched down next to an employee, D.P.  Defendant pointed a gun at D.P. and demanded money.  After D.P. handed defendant the money in the cash register, defendant asked whether there was more money and searched the shelves beneath the counter.  Defendant threatened to shoot D.P. if he found any more money.

On January 12, 2006, defendant entered a liquor store in Saugus less than 30 minutes before closing time.  He wore a grey hooded sweatshirt, gloves, and a black ski mask.  The store's owner, I.A., and his friend J.A. were present.  Defendant went behind the counter, crouched, and pointed a gun at J.A's chest.  He threatened to shoot if I.A. did not give him all of the money.  I.A. gave defendant all of the money in the cash register.  Defendant then repeatedly asked where "the hundreds" were hidden and said, "I know you hide your fucking money."  He fired the gun at the floor near I.A.'s feet, then pointed the gun at J.A. again and said, "Next time, the bullet will go inside of you."  Defendant demanded J.A.'s and I.A.'s wallets and took their money and J.A.'s phone.  He then searched the store for more money before leaving.

On January 13, 2006, defendant entered a convenience store in Saugus about 11:10 p.m.  He wore a black ski mask with a single opening for the eyes and a hooded jacket with an emblem on the hood.  He jumped over the counter, pointed a gun at employee, N.N., and demanded all of the money.  Defendant crouched down behind the counter.  After taking all of the money

3

from the cash register, defendant repeatedly asked where they hid the "big money," "big bills," and hundreds. He also asked for the location of the safe. N.N. said he did not have the key to the safe. Defendant searched the shelves beneath the counter and took one or more magazines, which were kept behind the counter, and left.

On January 24, 2006, defendant entered a store in Santa Clarita about 9:10 p.m. or 9:25 p.m. He wore a black ski mask and held a gun. He told an employee, K.S., to give him all of the money. As K.S. complied, defendant said he just wanted "large bills" and "hundreds." He also asked K.S. to open the safe, but K.S. did not have the key. Defendant searched a cabinet before leaving through the back door.

On April 4, 2006, defendant entered a liquor store in Canyon Country between 10:00 p.m. and 11:00 p.m. As employee A.S. was turning off the lights and preparing to close the store, defendant came up to him on the employee side of the counter and yelled at him to sit on the floor. Defendant had a revolver in his hand and was wearing a big jacket, gloves, and a ski mask with a single opening around the eyes. Defendant crouched down and demanded that A.S. give him all of the money. A.S. opened the register, and defendant took all of the money from it. Defendant repeatedly asked where A.S. kept the "hundreds," and said, "I know you hide them!" A.S. handed defendant two stacks of money hidden behind some liquor bottles. Defendant searched the area near the cash register, then left.

After his arrest, investigators found a loaded nine-millimeter handgun and a .380 caliber semiautomatic handgun in his apartment. These firearms were registered to defendant. Detectives also found an unregistered loaded .38 caliber revolver in defendant's vehicle.

A jury convicted defendant of eight counts of second degree robbery (§ 211) and found that defendant personally used a gun

4

in the commission of each offense (§ 12022.53, subd. (b)) and personally discharged a gun in the commission of four robberies committed on June 16, 2005 and January 12, 2006 (§ 12022.53, subd. (c)).

In sentencing defendant, the court imposed the upper term of five years on the principal count—the robbery of H.H. on June 16, 2005—plus 20 years for the related firearm discharge enhancement. For the convictions of four robberies in which defendant used but did not discharge a firearm, the court sentenced defendant to consecutive terms of 4 years 4 months for each count, comprised of one year for each robbery plus 3 years 4 months for each firearm enhancement. On the remaining three counts involving defendant's discharge of a firearm, the court sentenced defendant to consecutive terms of 7 years 8 months, comprised of one year for each robbery plus 6 years 8 months for each of the firearm enhancements.[2] The total prison term was 65 years 4 months.

In 2011, this court affirmed defendant's convictions in an unpublished opinion. (*People v. Johnson* (May 25, 2011, B216951).)

### B.    *Resentencing*

In March 2019, the Secretary of the CDCR (the Secretary) sent a letter to the superior court "to provide the court with the authority to resentence [the defendant], pursuant to . . . section 1170, subdivision (d)(1)." The Secretary enclosed with the letter a report that describes defendant's work, volunteer activity, and educational achievements during his incarceration, among other information. The letter states: "[Defendant] has remained disciplinary free since his arrival to CDCR, with the exception of . . .

---

[2] The court also imposed 10-year terms for the personal firearm use enhancements (§ 12022.53, subd. (b)) on counts 8, 9, and 19, but stayed those terms pursuant to section 12022.53, subdivision (f).

one rules violation report dated October 2, 2011, for fighting. A review of [defendant's] file reveals he has participated and on many occasions been a facilitator for self-help groups. [Defendant] has earned 17 laudatory chrono[s] from various staff and volunteers, this commitment to a positive change will assist [defendant] in a successful transition back into society. [Defendant] is commended for his rehabilitative endeavors to better himself. [¶] Having reviewed the enclosed documentation, it appears that [defendant's] sentence warrants the attention of the court. Pursuant to . . . [s]ection 1170, subdivision (d), as the Secretary [of the CDCR], I recommend the inmate's sentence be recalled and that he be resentenced." (Capitalization omitted.) The letter did not recommend any particular sentence.

On July 24, 2019, the superior court appointed counsel for defendant and set a date for a hearing.

In November 2019, defendant filed in the superior court a brief in support of resentencing. Specifically, he requested that the court resentence him by striking or dismissing all firearm enhancements. If that is done, defendant stated, he will already have served his full sentence and should be released.

Defendant submitted evidence of the following in support of his argument: (1) While incarcerated, defendant received from a community college Associate of Arts (AA) degrees in American studies, arts and humanities, social and behavioral science, and business; (2) In connection with his community college programs, he was recognized for making the "Honor's List" for three semesters; (3) a certificate from Microsoft Corporation recognizing him as a "Microsoft Office Specialist" for certain Microsoft software products; (4) certifications from adult education programs for three courses in semi-automatic sewing machine operation; (5) numerous acknowledgements and commendations regarding his participation in and completion of various educational, counseling, community

6

outreach, and self-improvement programs; (6) favorable statements from his prison work supervisors; (7) letters from family members and friends expressing favorable views of defendant's character and vowing to provide post-release support for defendant; and (8) a "re-entry and operations plan" in which defendant expresses remorse and personal responsibility for his criminal conduct and outlines a post-release support structure and his plans for obtaining housing, further education, and employment. (Capitalization omitted.)

The People filed an opposition to resentencing, asserting that the CDCR's recommendation "is ill-informed, ill-advised, and based on flawed information." Based on defendant's criminal history, the People concluded that "defendant is a dangerous and violent criminal," and that a "reduction of the defendant's sentence is not in the interest of justice."[3]

After a hearing, the court recalled defendant's sentence and struck the firearm enhancements related to the robberies that occurred on January 12, January 13, January 24, and April 4, 2006. (§§ 12022.53, subds. (b), (c) & (h).) The court did not change the original sentencing court's imposition of the upper term on the principal count or the imposition of consecutive terms on the subordinate counts. As a result, the court reduced defendant's sentence from 65 years 4 months to 42 years.

The court explained that it had "carefully reviewed" the moving and opposing papers and "all supporting documentation and exhibits." The court noted the following: (1) "[I]n 2009, the defendant received a maximum sentence of 65 years and 4 months after having been convicted of [eight] counts of robbery with the

---

[3] The People's opposition relied in part on descriptions of other robberies allegedly committed by defendant, but which were never proved.

7

jury also finding true the various firearms allegations including that the defendant personally discharged a firearm"; (2) "[T]he robberies in question were violent, dangerous and callous involving some incidents where the defendant personally discharged a firearm and or held a firearm to a victim's head while threatening to shoot them"; (3) "The defendant had a minimal prior criminal history and has earned at least [three] AA degrees with honors while incarcerated.  Similarly, he has received various certifications including one from Microsoft"; and (4) "The defendant's behavior and conduct while incarcerated ·has been[,] for the most part, exemplary and he has received letters of recommendation in support from various institutions, CDCR staff members[,] as well as family and friends."

The court concluded:  "Following very careful consideration of all that has been presented before it, this court is of the opinion that the defendant does merit resentencing consideration, but not to the point that he should be released from custody.  This is not, in any way a viable resentencing option considering the conduct demonstrated by the defendant in committing the [eight] violent robbery charges that he stands convicted of.  However, from review of the overall record presented, this court agrees that the defendant's subsequent achievements, behavior and recommendations in support, do indicate that resentencing pursuant to Penal Code section 1170 is appropriate."

## DISCUSSION

Upon the recommendation of the Secretary of the CDCR, a "court may . . . recall the sentence" of a defendant sentenced under the determinate sentencing law, "and resentence the defendant in the same manner as if they had not previously been sentenced, provided the new sentence, if any, is no greater than the initial sentence."  (§ 1170, subd. (d)(1).)  If the court resentences the

8

defendant under this provision, it "shall apply the sentencing rules of the Judicial Council so as to eliminate disparity of sentences and to promote uniformity of sentencing" and "may reduce a defendant's term of imprisonment and modify the judgment, including a judgment entered after a plea agreement, if it is in the interest of justice. The court may consider postconviction factors, including, but not limited to, the inmate's disciplinary record and record of rehabilitation while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the inmate's risk for future violence, and evidence that reflects that circumstances have changed since the inmate's original sentencing so that the inmate's continued incarceration is no longer in the interest of justice." (*Ibid.*)

We review the court's sentencing decision for an abuse of discretion. (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977; *People v. Carmony* (2004) 33 Cal.4th 367, 376.)

The scope and breadth of a court's discretion in making a particular decision depends upon the legal principles and policies governing the decision. (*People v. Carmony*, *supra*, 33 Cal.4th at p. 377; *People v. Eubanks* (1996) 14 Cal.4th 580, 595.) Here, the discretion a court has in resentencing a defendant under section 1170, subdivision (d)(1), is statutorily constrained by the requirements that the court "resentence the defendant in the same manner as if [the defendant] had not previously been sentenced," the defendant's "new sentence" shall be "no greater than the initial sentence," and the court "shall apply the sentencing rules of the Judicial Council so as to eliminate disparity of sentences and to promote uniformity of sentencing." (§ 1170, subd. (d)(1).) The court must also give the defendant credit for time served. (*Ibid.*) Defendant does not contend that the court failed to comply with these requirements.

9

The discretion implicated by defendant's challenge is established by the third sentence of section 1170, subdivision (d)(1): "The court resentencing under this paragraph may reduce a defendant's term of imprisonment and modify the judgment . . . if it is in the interest of justice." (§ 1170, subd. (d)(1).) In a similar context where the Legislature has provided courts with sentencing discretion to be exercised in furtherance of justice, our Supreme Court has explained that review under the abuse of discretion standard is "guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony*, *supra*, 33 Cal.4th at pp. 376–377.)

Here, defendant contends that the court erroneously based its decision solely upon the circumstances of his commitment offenses. The record does not support this argument. In reducing defendant's sentence by more than 23 years, the trial court relied in part on what it described as the "violent, dangerous[,] and callous" manner in which defendant committed a series of eight armed robberies, but also expressly considered defendant's educational achievements, exemplary behavior in prison, and the letters of recommendations defendant received from outside institutions, CDCR staff, family members, and friends. The court further

10

stated that it had considered all the evidence presented to it and that it agreed with defendant that his "achievements, behavior and recommendations in support, do indicate that resentencing . . . is appropriate."

Defendant points out that the People did not offer any evidence that defendant had done anything during his 13 years of incarceration that "could be considered negative, or which showed in any way during those 13 years that there was a risk of future dangerousness if [defendant] was released from custody." The court was not limited, however, to considering defendant's conduct in prison. Indeed, because the court was authorized to "resentence the defendant in the same manner as if [the defendant] had not previously been sentenced" and to apply the sentencing rules of the Judicial Council (§ 1170, subd. (d)(1)), the court had the resentencing authority to consider the objectives of "[p]unishing the defendant," and "[d]eterring others from criminal conduct by demonstrating its consequences" (Cal. Rules of Court, rule 4.410(a)(2) & (4)), as well as aggravating circumstances, such as facts that the "crime[s] involved great violence" or the "threat of great bodily harm" (*id.*, rule 4.421(a)(1)). Thus, although defendant's positive conduct in prison was relevant to the resentencing decision, so were the circumstances of his crimes. The lack of evidence of misconduct in prison, therefore, is not determinative.

Defendant supports his argument by asserting that there has been a shift in penological thinking away from punishment and toward rehabilitation, and that the interest of justice is served when a defendant, such as himself, has been sufficiently rehabilitated such that his release will not compromise public safety. Defendant points to the CDCR's "mission statement," which expresses the agency's goal of facilitating the successful reintegration of prisoners back to their communities "by providing

11

education, treatment, rehabilitation, and restorative justice programs." (https://www.cdcr.ca.gov/about-cdcr/vision-mission-values.) He also cites a 2016 legislative amendment to section 1170, subdivision (a)(1), which added "rehabilitation" and "restorative justice" to "punishment" as purposes of sentencing. (Stats. 2016, ch. 887, § 5.3, p. 5983.)

Defendant's assertion of a shift in penological policy is valid, particularly as to youthful offenders. This shift is evident in recent United States Supreme Court and California Supreme Court decisions, which reflect "a sea change in penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders." (*People v. Vela* (2018) 21 Cal.App.5th 1099, 1106; see, e.g., *Graham v. Florida* (2010) 560 U.S. 48, 74 ["sentence of life imprisonment without parole . . . cannot be justified by the goal of rehabilitation"]; *People v. Caballero* (2012) 55 Cal.4th 262, 268 [the state may not deprive juveniles who commit nonhomicide offenses "at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future"].)

This shift is also evident in recent legislation. In addition to adding "rehabilitation" and "restorative justice" to the purposes of sentencing in section 1170, subdivision (a)(1), as defendant observed, the Legislature amended section 1170, subdivision (d)(1) in 2018 to permit courts, when resentencing under that subdivision, to consider "postconviction factors, including, but not limited to, the inmate's disciplinary record and record of rehabilitation while incarcerated." (Stats. 2018, ch. 36, § 17, p. 1419.) The Legislature has also enacted section 3051, which, as amended, generally establishes youth offender parole hearings for prisoners who committed crimes when they were under 26 years of age. (§ 3051, subd. (a).) The purpose of this law is to provide youthful offenders with " 'a meaningful opportunity to obtain release' after they have . . . made ' "a showing of rehabilitation and maturity." '

[Citation.]" (*People v. Edwards* (2019) 34 Cal.App.5th 183, 198; see also *In re Williams* (2020) 57 Cal.App.5th 427, 434 [section 3051 is intended to provide motivation for prisoners to focus on rehabilitation].)

These changes, however, do not mean that every incarcerated person who compiles a strong record of rehabilitation is entitled to resentencing without regard to the prisoner's crimes. Although a shift toward rehabilitation in sentencing may be underway, that shift has not reached the point where *only* rehabilitation matters. The Legislature, while adding "rehabilitation" to the purposes of sentencing in section 1170, subdivision (a)(1), did not delete "punishment" as a purpose. And, in adding the language to section 1170, subdivision (d)(1), that permits resentencing courts to consider evidence of rehabilitation, the Legislature retained the direction that courts apply the sentencing rules of the Judicial Council, which continue to permit consideration of the circumstances of the crimes.

Lastly, defendant relies on standards governing the parole board's decision whether to grant parole. (See, e.g., Cal. Code Regs., tit. 15, § 2281, subd. (a) ["a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison"].) Defendant offers no authority for the application of parole standards in the sentencing context. Indeed, the two areas are governed by distinct statutory and regulatory schemes and nothing in those schemes suggest that the standards applicable to granting parole apply to the decisions made by sentencing courts.[4] Moreover, even the parole board,

---

[4] Felony sentencing is governed by, among other statutes and rules, sections 667 through 669, sections 1170 through 1170.95, and

when considering whether a prisoner is suitable for parole, is required to consider the circumstances of the prisoner's commitment offenses (§ 3041, subd. (b)(1); Cal. Code Regs., tit. 15, §§ 2281, subd. (b), 2402, subd. (b); see *People v. Braley* (2020) 52 Cal.App.5th 680, 687-688 [suitability for parole requires consideration of the circumstances surrounding the commitment offense].)[5]

For the foregoing reasons, we reject defendant's arguments and conclude that the court's resentencing decision was not an abuse of discretion.

---

sections 12021.5 through 12022.95, and rules 4.401 through 4.480 of the California Rules of Court.  Parole is governed by, among other statutes and regulations, sections 3040 through 3073.1 and Title 15, Division 2, Chapter 3 of the Code of Regulations.

[5] In his reply brief, defendant argued that the trial court was required to hear expert testimony as to defendant's current dangerousness.  Defendant did not raise this point below or in his opening brief and does not support it with citation to apposite authority.  We decline to address it.  (See *People ex rel. Feuer v. Superior Court (Cahuenga's the Spot)* (2015) 234 Cal.App.4th 1360, 1384 [court declined to address arguments not supported by citation to authority]; *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 [arguments raised for first time in reply brief are ordinarily waived].)

## DISPOSITION

The trial court order dated December 5, 2019, resentencing the defendant is affirmed.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


BENDIX, J.