Filed 2/10/22  In re S.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.S., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077309 |
| Plaintiff and Respondent, | (Super.Ct.No. J282749) |
| v. | OPINION |
| H.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

H.S. (father) appeals from a juvenile court's order at the 18-month permanency review hearing (Welf. & Inst. Code,[1] § 366.22) terminating his reunification services and setting a hearing under section 366.26 to consider the implementation of a permanent plan regarding his daughter, S.S. (the child). Father contends that the court failed to make the necessary finding that return of the child to his custody would create a substantial risk of detriment to her well-being, and that there was insufficient evidence to support a detriment finding. We affirm.

## PROCEDURAL BACKGROUND

On October 9, 2019, the San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the child, alleging that she came within the provisions of subdivisions (b) (failure to protect) and (j) (abuse of sibling). The child was 10 years old at the time. The petition specifically alleged that father and the child's mother, T.S. (mother),[2] failed to adequately protect the child from the conduct of the child's brother, L.J.,[3] and that father and mother (the parents) had two previous

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

[2] Mother is not a party to this appeal.

[3] The petition alleges that L.J. is the child's half sibling. However, the detention report refers to him as her brother. To avoid confusion, we will simply refer to him as her brother.

dependency cases through Los Angeles County regarding the child's sibling, C.S. The petition further alleged that mother had a history of substance abuse.

The social worker filed a detention report and stated that on October 6, 2019, CFS received a referral alleging caretaker absence, general neglect, and physical abuse. It was reported that mother left the child at home with her adult brother, L.J. Mother told the child to leave if she felt uncomfortable with him, but when the child attempted to leave, he tried to drag her back into the house. The child grabbed a box cutter and cut him. The police attempted to reach mother, but she did not answer her phone or call back. The police called father, but he said he was unable to come to get the child because he was in Los Angeles.

A social worker interviewed the child at the police station. The child said she did not feel safe in her home due to L.J. being there. She said he talked to himself and had become physically aggressive with her and mother in the past. She also said he smoked marijuana that made him "act oddly." The child had told mother multiple times that she was afraid of L.J. and did not want to be left alone with him. When she was left alone with him earlier that day, she said L.J. told her she could not leave because someone was trying to kidnap her. When she attempted to leave, he grabbed her, and she became fearful. Consequently, she grabbed the box cutter and cut him so she could get away. The child also said that two or three times a week mother would go to the store and come back "acting weird."

The social worker spoke with the child's adult sister, C.S., who came to the police station to get the child. C.S. said she knew her brother smoked marijuana and explained

that he began talking to himself recently, and he believed he was being watched by the FBI. He also believed he "owns everything because he is God." C.S. further stated that he had become physically and verbally aggressive with their mother.

When mother finally came to the police station, she appeared fidgety, her eyes were glossy, and she had difficulty following the conversation with the officer. Mother said she knew her son smoked marijuana and that he might be using crystal methamphetamine. She said she would leave the child with him if she had to go to the store. Mother initially denied any physical altercations with L.J., but then described a time when he tackled her. When the child attempted to intervene, he pushed the child. Mother described another time when he tried to attack her (mother). When asked why she continued to leave the child with L.J., she denied that the child ever told her she was uncomfortable with him or afraid of him. Mother continuously said the child was fine with L.J.

The following day, the social worker obtained a warrant to remove the child since mother was not able to protect her from L.J. A police officer served mother with the warrant, and it was reported that mother was having erratic body movements, including fidgeting, moving her lower jaw back and forth, and constantly sticking her tongue out.

The social worker called father two times and left voicemails. When he called back, he was informed of the child's removal and he asked what the allegations were. As the social worker was explaining everything, father said his phone was dying. He asked her to text him the information and said he would call her back in an hour. He did not do so, and when she called him two hours later, there was no answer.

4

The court held a detention hearing on October 10, 2019, and detained the child.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on or around November 1, 2019, recommending that the child be removed from the parents' care and that both parents be offered reunification services. The social worker reported that mother admitted being a recreational user of cocaine, stating that she started using at the age of 18 and used it on and off for months at a time since then. (She was 51 years old at the time of the writing of the report.) Mother said she relapsed and resumed using cocaine over the past two months. On October 24, 2019, father stated that he was aware of mother's past drug history, but was not aware that she had used drugs recently.

Mother admitted she knew L.J. smoked marijuana and drank alcohol, but she said he had the right to do so since he was an adult. She failed to see the risk of leaving the child alone in the home with him. When the social worker attempted to interview L.J., he was hostile on the phone and refused to answer any questions. The social worker did a background check on L.J. and discovered that he had a criminal record, including convictions for resisting an officer (Pen. Code, § 148, subd. (a)) and criminal threats (Pen. Code, § 422). In 2019, he was arrested on various charges, including willful cruelty to a child (Pen. Code, § 273a, subd. (b)), but the prosecution was suspended as he was deemed mentally incompetent.

On October 24, 2019, the social worker interviewed father, who said he had not been present in the home most of the time since he was seeking housing in Los Angeles County. He added that he was a commercial truck driver and was only home three or

5

four days a month. However, he was no longer able to work as a truck driver, due to health issues. Since he had no income and did not want to be a burden on his family, he moved out and signed up for homeless services in Los Angeles County. Mother reported that the idea was for father to obtain housing in Los Angeles County utilizing the "homeless voucher" and then attempt to transfer the voucher to San Bernardino County and add mother and the child to his case, so the family could benefit from Section 8 housing. The social worker stated that the problems requiring intervention were mother's substance abuse, father's absence from the home and lack of involvement in parenting, and mother's poor parenting decisions. She further noted that mother and father's lack of ability to co-parent, due to father being out of the home the majority of the time, affected the family's ability to function.

The social worker also reported on the parents' child welfare history. On September 21, 2003, Los Angeles County received a referral alleging caretaker absence by mother. It was reported that mother was arrested for using crack cocaine, and the allegations were substantiated. Between September 21, 2003, and December 10, 2004, the parents had an open case in Los Angeles County regarding C.S.[4] The allegations in that case included that mother had a substance abuse history, and she was arrested for child endangerment, and that father knew of her substance abuse, but continued to leave C.S. in her care, thereby failing to protect the child. The petition also alleged that father

---

[4] The social worker reported that C.S. and L.J. were subjects of the dependency; however, the petition reflects that the case only concerned C.S.

6

physically abused C.S. The parents later reunified with C.S., after completing parenting education classes, family counseling, and other requirements. Subsequently, between February 17, 2005, and February 13, 2006, they had another open case with Los Angeles County regarding C.S.[5] The petition alleged that the parents had a history of domestic violence and had violently assaulted each other in C.S.'s presence, that father had physically abused C.S., and that mother had a substance abuse history. The parents eventually reunified with C.S., after successfully completing the court-ordered programs.

The court held a jurisdiction/disposition hearing on November 1, 2019, and sustained the petition, declared the child a dependent, removed her from the parents' custody, and ordered the parents to participate in reunification services. Father's case plan required him to complete a parenting education program. Mother's plan included the requirements that she participate in counseling, substance abuse testing, and an outpatient substance abuse program. The court also ordered supervised visits once a week.

*Six-month Status Review*

The social worker filed a six-month status review report on May 29, 2020, recommending that the parents continue to be provided with reunification services. The child's foster mother reported that the child was not following the rules she set up for the child not to use her phone after 9:00 p.m. Also, the child frequently refused to go to

---

[5] We note the record reflects other referrals received regarding C.S. and/or L.J. from 2000, 2001, 2002, and 2005, alleging general neglect due to mother's drug use and physical and emotional abuse by mother. However, these other referrals were closed as inconclusive or unfounded.

7

school. The social worker informed the child, the parents, and the foster mother that the child was required by law to attend school, and that if she missed it for an unexcused reason, the social worker would submit paperwork to have her placed in a group home. The social worker reported that, prior to being detained, mother would not allow the child to go to school because of her high blood pressure. Mother claimed the school staff said the child should be home schooled. However, when the social worker asked for medical documentation, mother was unable to provide any.

As to visitations, the social worker reported that the parents were having consistent visits in person, supervised by the social worker. Pursuant to the Governor's stay-at-home order, the visits switched to video chats but were still supervised.

The social worker spoke with the parents, and father reported that he completed his parenting classes. Mother said she completed her parenting classes, therapy, and outpatient treatment. Nonetheless, the social worker opined that it would be detrimental to return the child to either parent since they had not had unsupervised visits with her. Furthermore, the parents lived in separate homes most of the time, and their homes needed to be assessed before the child could be returned. The social worker stated that the parents also needed to complete individual therapy and show they had benefited from it.

The social worker filed an addendum report on June 1, 2020, and attached a copy of a police report documenting a domestic violence incident between father and mother on April 20, 2020. Police responded to a call at mother's residence. The officer observed that mother had blood running down her face, coming from the corner of her

8

eye.  Mother reported that she and father had a verbal argument that escalated, and she went to the bedroom and shut the door.  Father was still angry at her and began pounding on the bedroom door and threatening her.  Mother became fearful, so she left the bedroom, pushed past him, and went to the kitchen to grab a hammer.  When father saw her with the hammer, he took it from her and struck her in the face with his fist, causing her to fall onto the floor.  Father continued to hold the hammer as he stood over the victim.  He eventually put it down, and the victim had L.J. call the police.  Father was arrested.[6]  Subsequently, the social worker had separate telephone conversations with father and mother.  Mother said they had an argument, and that father was arrested, but she denied any domestic violence and said she did not know who called the police.  She also denied having any physical injuries.  Father denied they had a verbal argument and said he told the police there was no arguing, fighting, or hitting, and he did not know why someone would call the police.  He said he was arrested that night and was released from custody early the next morning.

The court held a six-month review hearing on June 5, 2020, and continued the parents' reunification services.  The case plan was updated to require that they participate in a domestic violence program.

*Twelve-month Status Review*

The social worker filed a 12-month status review report on October 2, 2020, recommending that reunification services be continued.  The report indicated that the

---

[6] The record does not indicate what occurred after father was arrested (e.g., if he was charged with a crime).

9

child had issues with taking items that did not belong to her, refusing to take her prescribed hypertension medication, not wanting to participate in therapeutic services with her assigned therapist, and refusing to attend school regularly. When she was in school, she accessed inappropriate websites while in class and had to have her Chromebook taken away from her. The child was also having "sexual communication" with an unidentified male through social media. The social worker reported that the child was previously placed in a foster home on October 7, 2019. However, due to her negative behaviors, she was removed from the home on October 1, 2020, and placed in a group home since she needed a higher level of care.

The social worker further reported she informed the parents that the child refused to go with the foster mother to run errands since she was upset about her Chromebook being taken away. The social worker asked the parents to suggest consequences for the child's behavior of not following the foster mother's instructions. The social worker noted that neither parent appeared to be very concerned about the fact that the child disobeyed her foster mother's instructions. Father did not get back to the social worker with any suggestions.

The social worker also reported that mother had moved into father's apartment on September 3, 2020, and their apartment needed to be assessed for safety prior to the child being returned to the parents' care. The social worker reported that a child and family team meeting occurred on September 21, 2020, and the recommendation was to continue the parents' services. The social worker opined the child should not be returned to the parents' care at that time because of a lack of unsupervised visits together, the social

10

worker's belief that the parents could not responsibly manage her negative behavior, and because her behavior would require a higher level of care. The social worker stated it was critical that the child have a 29-day visit with the parents before considering her return to their care since the social worker wanted to assess the child's level of cooperation with going to school, following her parents' instructions, and medication compliance. If the child was noncompliant and the parents did not set appropriate boundaries and consequences, the social worker would recommend that the child continue residing at her group home until a relative or other person could be cleared for placement.

The court held a 12-month status review hearing on October 16, 2020. It continued the child as a dependent, continued reunification services, ordered unsupervised visits once a week, and gave CFS the authority for the 29-day visit and to place the child with the parents "by standing order."

*Eighteen-month Status Review*

The social worker filed an 18-month status review report on March 26, 2021, recommending that the court continue services for 90 days. She reported that on November 13, 2020, she assessed the parents' new apartment and noted that it was clean and well-maintained. She also visited the child at her group home, and the child appeared to be doing well there.

On March 5, 2021, the social worker talked to mother about the domestic violence incident that occurred on April 19, 2020, and mother denied there was any domestic

11

violence between her and father and said there was no argument between them. She then changed her mind and said there was domestic violence.

The social worker talked to father that same day, and he denied any domestic violence between him and mother on April 19, 2020. He said mother had a hammer and was trying to hang something on the wall. He wanted to help so he tried to take the hammer from her. Father said, although they may have argued, there was no domestic violence.

The social worker attached a review report from the child's group home, indicating that the child was diagnosed with Major Depressive Disorder and was participating in individual therapy. She had shown improvement the past few months in coping with her emotions and effectively communicating with others.

The social worker opined that it would be detrimental to return the child to the parents and that the case should be continued for 90 days since the parents had not benefited from their domestic violence prevention classes or therapy, to the extent they should have. They both continued to deny the domestic violence incident on April 19, 2020, in contrast to the police report from that day. The social worker opined that they both needed to retake a domestic violence prevention class and complete individual therapy. Furthermore, the parents had not had overnight visits with the child, and she needed to assess the family dynamics when overnight visits occurred. The social worker noted that the parents were "extremely lax" in allowing the child to stay home, rather than go to school prior to CFS involvement, and she wanted to ensure they were

responsible enough to have the child attend school. The social worker recommended a visitation plan with a series of overnight visits, so she could assess the parents' progress.

The court held an 18-month hearing on April 6, 2021, but continued the matter until June 25, 2021.

On June 18, 2021, the social worker sent an additional information memorandum to the court, recommending that the court terminate father's and mother's reunification services. Mother missed multiple drug tests and had two positive tests. Furthermore, on May 24, 2021, a referral was called in to the child abuse hotline alleging that mother may have been under the influence of a controlled substance during a recent visit with the child, but the investigation was still open.

The social worker reported that on June 10, 2021, she emailed the police department requesting any reports regarding the parents. She had not received any police reports, so it was unknown if domestic violence was occurring between the parents. However, since the parents were residing together and their behaviors affected each other, the social worker believed the child would be at risk of possible abuse and neglect if returned to their home. Thus, she recommended the court find the parents had failed to participate regularly and make substantive progress in, or complete, the court-ordered case plan, and find that custody by the parents continued to be detrimental to the child and return to their custody would create a substantial risk of detriment to her safety, protection, and well-being. The social worker further recommended that the court order the parents' reunification services to be terminated, that the child be placed in a concurrent planning home, and the permanent plan of legal guardianship be implemented.

13

The court held a hearing on June 25, 2021. Mother's counsel informed the court that mother returned to live where she was previously living with her son. Counsel said mother would be seeking treatment for substance abuse, and she was "going to stay out of the picture so that" there would be an opportunity for father and the child to reunify. Father's counsel confirmed that father and mother were no longer living together and stated that father had completed his case plan. He pointed out that with the domestic violence course, father came to realize that what had occurred was domestic violence "whereas, earlier, he thought that . . . domestic violence was only of a physical nature." Thus, he asked the court not to terminate father's services.

County counsel informed the court that mother was actively using drugs, father did not report her use, and father and mother were living together. County counsel also pointed out that father just realizing now that attacking mother with a hammer was domestic violence did not show benefit from his course. Father had minimized the domestic violence throughout the case. She argued that the parents were given extra time, and neither of them could safely and appropriately care for the child. Counsel for the child agreed with county counsel and asked the court to terminate services.

The court agreed with CFS's recommendation, noting that father had no concerns about mother, who had been using drugs and tested positive for cocaine on May 14, June 2, and June 14, and failed to show up for testing on May 7 and June 9. The court further noted that the child was detained on October 7, 2019, and, not having seen the benefit "as of this late date," agreed with the recommendation to terminate services. It then stated it was going to adopt the findings and orders attached to the report, which showed the

14

hearing date, June 25, 2021. The report included the finding that return of the child to mother and father at that time would create substantial risk of detriment to the child's safety, protection, or physical/emotional well-being. The court stated that it was finding by clear and convincing evidence that the parents had failed to participate regularly and make substantive progress in or complete their court-ordered case plans. It further stated that the child was continued as a dependent and was in her group home, and it gave CFS authority to place her in a concurrent planning home. The court terminated the services of both parents and ordered the "permanent plan of placement in foster care with a permanent plan of legal guardianship." It then continued the matter for a permanency planning review.

## DISCUSSION

### The Evidence Was Sufficient To Support the Court's Detriment Finding

Father contends that the juvenile court failed to make the necessary detriment finding under section 366.22, and that if there was an implied detriment finding, such finding was not supported by substantial evidence. He thus asks this court to reverse the detriment finding and remand the matter with instructions to return the child to him under a family maintenance plan or grant him more reunification services. We conclude that father's contentions have no merit.

A. *Relevant Law*

"The Legislature has determined the juvenile court may generally offer family reunification services for a maximum period of 18 months. [Citations.] At the 18-month permanency review hearing the juvenile court must order a child returned to a parent's

15

custody unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being." (*Georgeanne G.v. Superior Court* (2020) 53 Cal.App.5th 856, 864, fn. omitted; see § 366.22, subd. (a).) "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a)(1).) If the child is not returned to a parent at the permanency review hearing, the court must terminate reunification services and order a hearing pursuant to section 366.26. (§ 366.22, subd. (a)(3).)

"The juvenile court's detriment finding is reviewed under the substantial evidence standard." (*In re A.J.* (2015) 239 Cal.App.4th 154,160.) "[T]he reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564 (*Ricardo L.*); see *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.)

B. *The Court Made a Finding of Detriment*

Father claims the court failed to make the required detriment finding under section 366.22, subdivision (a), that return of the child "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

16

Thus, he contends a reversal is required. The record belies this claim. At the 18-month hearing on June 25, 2021, the court agreed with the recommendation to terminate services since it did not see that father had benefitted from his services. It stated, "The Court is going to go ahead with the following findings and orders—and they're attached to the 6.7 of today's date—that the findings are going to be as follows, and they are adopted as they are amended." In relevant part, the 6.7 report stated, "[The] Court finds by preponderance of the evidence that custody by . . . father . . . continues to be detrimental to [the child] . . . and that return of [the child] to . . . [father] . . . at this time would create [a] substantial risk of detriment to [her] safety, protection or physical/emotional well-being." Accordingly, the court complied with the requirement of section 366.22.

In his reply brief, father claims the court failed to make the required finding of detriment and instead simply adopted CFS's recommendations, which "violated the separation of powers doctrine where the goal and purpose of reunification intended by the Legislature was frustrated by having no judiciary make express findings." He further claims that "as an issue of first impression, this court should hold that the juvenile court violated the separation of powers doctrine by delegating its judicial function to make express finding [*sic*] of detriment to [the] Department by simply adopting its recommendations." We decline to do so. "Withholding a point until the reply brief deprives the respondent of an opportunity to answer it." (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 (*Baniqued*).) "Hence, a point raised for the first time therein is deemed waived and will not be considered, unless good reason is shown for failure to

17

present it before." (*Ibid.*) No good cause is shown here. In any event, father's position is untenable. He appears to claim that CFS is attempting to "overtake the powers and interfere with the functions" of the Legislature "by arguing that the juvenile court does not need to make mandated express findings, but could simply adopt its recommendations." CFS making an argument on appeal does not involve "one branch of the government . . . overtak[ing] the powers . . . of another," as he claims. Moreover, courts routinely adopt findings and orders recommended by child protective services agencies. Once adopted by the court, those findings are unquestionably the express findings of the court and no longer solely the recommendations of the child protective services agencies. (See *In re P.R.* (2015) 236 Cal.App.4th 936, 940; *In re A.A.* (2008) 167 Cal.App.4th 1292, 1311; and *In re Gabriel G.* (2005) 134 Cal.App.4th 1428, 1433.)

C. *There Was Sufficient Evidence to Support the Court's Detriment Finding*

Father contends CFS failed to present substantial evidence that the child would be at a substantial risk of detriment if returned to his care. He argues that the child was struggling in her group home and that returning her to his custody and/or offering him more services were "safer and more favorable options" than keeping her in the group home. He further claims the social worker's recommended finding of detriment was based on the opinion that he "had not yet reached the emotional insight to return [the child] to his custody." He argues that "a parent's failure to internalize what he has learned in classes cannot be the sole basis for a finding of detriment," and points out that mother was the one with the drug problem, and he had separated himself from her by

18

maintaining a separate residence; moreover, he never used drugs, he completed the court-ordered programs, and he maintained loving and regular visitation with the child.

Section 366.22 provides that "[t]he failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a)(1).)

Contrary to father's claim, the social worker did not base the finding of detriment on the opinion that he "had not yet reached the emotional insight to return [the child] to his custody." Rather, she recommended, and the court adopted, the findings that father failed to participate regularly and make substantive progress in his court-ordered case plan, and that "return of [the child] to [father] at this time would create substantial risk of detriment to [her] safety, protection or physical/emotional being." We note that mere completion of a case plan is not sufficient to have a child returned to a parent, as the court is required to "consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he . . . availed himself . . . of services provided." (§ 366.22, subd. (a)(1); see *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139-1141.)

The evidence was sufficient to support the court's detriment finding, as father failed to demonstrate that he benefitted from his case plan. We observe that, even after completing a domestic violence prevention program, he continued to deny that domestic violence occurred on April 19, 2020. The police report showed that mother had a verbal argument with father, and he pounded on the bedroom door and threatened her. She left the bedroom, pushed past him, and went to the kitchen to grab a hammer. Father took the hammer from her and then struck her in the face with his fist, causing her to fall onto the

19

floor. The responding police officer observed that mother had blood running down her face and arrested father. In contrast, when interviewed right after the incident, father denied that he and mother had an argument. He told the police there was no arguing, fighting, or hitting, and he did not know why someone would call the police. Consequently, the social worker updated father's case plan to require him to participate in a domestic violence program.

The social worker interviewed father about the incident again on March 5, 2021, after he had completed his domestic violence course, and he continued to deny any domestic violence occurred. Thus, he apparently had not gained any insight from taking the course. At that time, the social worker recommended that the court continue the case for 90 days, opining that father needed to retake a domestic violence prevention class and complete individual therapy. She also stated that the parents had not had overnight visits with the child, and she needed to assess the family dynamics when overnight visits occurred. The social worker also wanted to ensure the parents were responsible enough to make the child attend school.

Subsequently, in the report dated June 25, 2021, the social worker recommended that the court terminate father's (and mother's) reunification services. She changed her recommendation in light of the current circumstances, including that mother failed to show up for multiple drug tests, had two positive tests, and admitted that she used cocaine. Furthermore, on May 24, 2021, a referral was called into the child abuse hotline alleging general neglect since mother may have been under the influence during a recent visit. (The investigation was still open.) In addition, the social worker did not know if

domestic violence was still occurring between the parents, and they had still not had overnight visits with the child. The social worker believed the child would be at risk of abuse and neglect if returned to father since he and mother were residing together, and their behaviors affected each other.

At the 18-month review hearing, father asked the court not to terminate his services since mother had moved out in order for him and the child to reunify.[7] Father's counsel noted that because of his domestic violence course, father "now realize[d] that what had occurred was domestic violence, whereas, earlier, . . . he thought that domestic violence was only of a physical nature." In fact, father was still denying that he and mother engaged in domestic violence. The court properly agreed that father had not benefitted from his services "as of this late date" and adopted the social worker's recommended findings and order.

Even on appeal, father continues to deny that he was involved in domestic violence. He asserts that he was not charged with a crime for the April 2020 incident, that it was mother who got the hammer for "self-defense to a verbal argument," and that he grabbed it out of her hand "so no further injury would happen." It is clear that father has failed to benefit from his domestic violence class since he still does not acknowledge there was domestic violence between him and mother notwithstanding mother's report to the police that he hit her, the officer's observation of mother's bleeding face, father's

---

[7] There was no evidence presented that mother had actually moved out.

21

arrest, and his acknowledgement of some quarrel between him and mother during the incident.

Father also maintains that he had no other history of domestic violence, and that the two prior dependency cases had to do with mother's drug use and *her* conduct. Contrary to father's contentions, the record reflects the 2003 petition alleged that C.S. came within section 300, subdivision (serious physical harm) since father physically abused her. The allegations were substantiated, and a dependency case was opened. Similarly, the 2005 petition alleged that father physically abused C.S., and also that he and mother had a history of domestic violence, in which they violently assaulted each other in C.S.'s presence. Father (and mother) eventually reunified with C.S. in both cases, after successfully completing the court-ordered programs. However, it is concerning that, even after completing services in two prior dependencies, as well as in the current case, father denies his child welfare history and history of domestic violence.

We further observe that the social worker opined at the outset that father's absence from the home and lack of involvement in parenting were some of the reasons the family required intervention. He was frequently away from the home while working as a truck driver, and when he stopped working, he spent the majority of his time in Los Angeles County seeking a residence for himself through a homeless services program. Even though father was aware of mother's substance abuse problem, he moved out and left the child in her care. Thus, father was largely absent from the child's life prior to her being removed, and he did not try to protect her from mother or L.J. Moreover, the social worker opined that the child needed a higher level of care due to her behavioral issues

22

and did not believe father could responsibly manage her negative behaviors. Therefore, contrary to father's claim, we do not see how returning the child to him was a more favorable option, in light of these circumstances. As to his alternative request for more reunification services, he was provided with services in two prior dependencies, as well as 18 months of services in the current dependency, and he has yet to demonstrate benefit from them.

In his reply brief, father argues that we should reject respondent's contention that his denial of the domestic violence alleged by mother was evidence that returning the child to his custody would be detrimental to her well-being. He claims that he was simply exercising his First and Fifth Amendment constitutional rights "by way of refusing to make any self-incriminating statements just to obtain favor from the Department or the court." He further asserts that "as an issue of first impression, this Court should hold that a parent's right to reunify with his or her child under the dependency scheme should never be based on admission of guilt, and that a parent's refusal to make a self-incriminating statement cannot by itself serve to support a detriment finding." We decline to do so. Father makes this claim for the first time in his reply brief, thus depriving respondent of an opportunity to respond. As such, he has waived his claim, and we will not consider it. (See *Baniqued*, *supra*, 85 Cal.App.4th at p. 29.)

Finally, we recognize, as father points out, that the child was challenging and had behavioral issues in her placement and group home. He claims that because of all her problems in foster care and the group home, returning the child to his care was a better

option than keeping her in a group home.  He points out that he was now living apart from mother, as she had moved into her own home, and his home was safe.  However, the problems the child had in her group home and father's lack of substantive progress in reunification services bear upon the detriment to the child if the child were returned to father as they demonstrate father's inability to give this very troubled minor the care and direction that she needs.

In any event, the court ordered the child to be placed in foster care with the permanent plan of legal guardianship, not to stay in the group home.

We conclude the evidence was sufficient to support the court's finding that return of the child to father would create a risk of detriment to her safety, protection, and well-being.  On this record, we cannot say the juvenile court's determination of detriment exceeded the bounds of reason, and therefore we will not disturb its determination. (*Ricardo L.*, *supra*, 109 Cal.App.4th at p. 564.)

<u>DISPOSITION</u>

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>FIELDS</u>
J.

We concur:

<u>McKINSTER</u>
Acting P. J.

<u>SLOUGH</u>
J.

24