Filed 1/9/25  P. v. Osborne CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B329334 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. NA112395 |
| JOHN OSBORNE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judith L. Meyer, Judge. Affirmed.

Robert E. Boyce under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION AND PROCEDURAL BACKGROUND

A jury convicted John Osborne of first-degree murder, finding he killed his girlfriend, Nancy Romero, with premeditation and deliberation. (Pen. Code[1], § 187, subd. (a).) It also found true allegations that he committed the murder by personally and intentionally discharging a firearm, namely, a handgun, which caused Romero to suffer great bodily injury and death. (§ 12022.53, subds. (b)-(d).) The trial court sentenced Osborne to 50 years to life in prison, consisting of a 25-year-to-life term for the murder and a 25-year-to-life term for the firearm enhancement.

On appeal, Osborne contends his conviction must be reversed because the trial court abused its discretion by allowing the prosecution to present evidence showing that, after Romero's death, the police recovered firearms and firearm-related paraphernalia from his bedroom, which were not used to commit the murder. He also argues that his sentence must be vacated, as the trial court abused its discretion by declining to strike the firearm enhancement under section 1385, subdivision (c). As discussed below, we reject Osborne's contentions and affirm.

## FACTUAL BACKGROUND

### I.     Prosecution Evidence

Between 6:55 and 7:00 a.m. on July 11, 2019, Mercedes Guaspari left her home near the Long Beach courthouse to move her car for street sweeping. As she was walking to her car, she saw a couple – later identified as Osborne and Romero – arguing

---

1      All undesignated statutory references are to the Penal Code.

on the sidewalk. As Guaspari tried to walk past the couple, Romero stepped out in front of her and started walking. Osborne followed, walking behind Guaspari. Growing uncomfortable, Guaspari stepped off the sidewalk and began walking in the street. Romero then quickened her pace, and Osborne followed her. Soon thereafter, Guaspari lost sight of the couple.

Less than an hour later, at approximately 7:50 a.m., Romero was found lying on a sidewalk near the Long Beach courthouse with a bloody gunshot wound to her back. An ambulance transported Romero to the hospital, where she died.

At around 8:00 a.m., Osborne arrived at his mother's house. His mother testified that Osborne was upset and crying, and appeared to be under the influence of alcohol. Osborne said he had gotten into a fight with Romero, that he thought she was going to leave him, and that he had shot her. A few hours later, after shaving his head, Osborne left his mother's home with her boyfriend. After that, Osborne's mother did not see or hear from Osborne again.

During their investigation of Romero's death, the police recovered several items from the scene of the shooting and nearby areas, which included the following. On the ground near where Romero had been found, the police collected a discharged .40-caliber cartridge casing. In a nearby alley, they found the black leather jacket Osborne had been wearing earlier that morning in a recycling bin. From a dumpster in the same alley, the police recovered a black leather holster. Inside one of the holster's slots was a magazine marked "Sig Saur P229," which contained 10 .40-caliber rounds of ammunition.

Romero's autopsy revealed the cause of her death to be a gunshot wound to the right mid-back. A .40-caliber bullet was

recovered from the center of Romero's chest. The bullet perforated several organs, including her heart, right lung, and liver. A .40-caliber Sig Saur P229 handgun could have fired that bullet, along with the cartridge casing found at the scene of the shooting. A gun of that type was registered to Osborne, but was not recovered by the police.[2]

## II.    Defense Evidence

Osborne testified he owned several firearms, all of which were registered to him except a .357-caliber revolver. When outside, he always carried a .40-caliber Sig Saur P229 at the small of his back in a concealed, custom-made holster worn around his waist. While holstered, the Sig Saur P229 always had a round in the chamber and was ready to shoot. The holster also contained an extra magazine with 10 rounds of .40-caliber Smith & Wesson ammunition. Osborne testified he carried a firearm with him at all times because he is a strong advocate of the Second Amendment.

With respect to his relationship with Romero, Osborne testified that they started dating soon after they met on Christmas Eve in 2018. Romero moved in with him two to three months later. She used methamphetamine regularly, and they argued often about her drug use.

A few months into their relationship, Romero became pregnant with Osborne's child. She continued to use methamphetamine while pregnant. In May 2019, she had a miscarriage, which Osborne believed was related to her drug use.

---

2    We discuss the firearms and firearm-related paraphernalia later recovered from Osborne's bedroom in part I.A of the Discussion.

According to Osborne, late in the night before the shooting, he and Romero went to a bar. Afterwards, they went to a pier by the beach and later returned home. Romero then disappeared for an indeterminate amount of time. When she returned home in the early morning, Osborne suspected she had been using methamphetamine and confronted her. At that point, they began to argue. After a while, Romero started packing her bags, said she was going to leave, and left the home. Osborne followed her because he did not want her to leave and sought to get her to come back home. Osborne was carrying his firearm when he left the house.

Osborne testified that he and Romero left their home at approximately 6:50 a.m. Romero started to walk around the block, and Osborne followed her. They walked and argued for the next 30 minutes, during which time Romero repeatedly told Osborne she was going to leave him, and Osborne implored her to go back home. At some point, Osborne testified, Romero "told [him] that she's glad she didn't have [his] [expletive] baby." She then turned and started walking away from him. In response, Osborne "snapped." He turned around and drew his gun as he started walking away from Romero. To do so, he reached under his jacket and shirt, grabbed the gun's handle, which was resting flat against his back, and lifted the gun up six inches to unholster it. Then, Osborne testified, he raised the gun to nearly shoulder height and blindly fired a shot behind him, in Romero's direction. He heard the gun go off, but did not look back toward Romero.

Osborne testified that, after firing the gun, he did not call or flag someone down for help. Instead, he continued to walk and threw "everything" in trash cans in an alley. After that, he went to his mother's house. There, he told his mother that he thought

Romero was going to leave him, and that he had shot her. He later shaved his head and left to stay at a motel. Three to four days later, he turned himself in to the police.

## DISCUSSION

### I. Motion in Limine

#### A. Relevant Background

Osborne filed a motion in limine seeking to exclude, among other things, any evidence relating to the firearms and firearm-related paraphernalia found by the police in his bedroom. He argued the evidence was inadmissible because it was irrelevant, and its probative value was substantially outweighed by the risk of undue prejudice. At the hearing on Osborne's motion, the prosecution contended the disputed evidence was relevant to showing Osborne's identity as the shooter and whether the killing was premeditated. The trial court denied the motion and permitted the prosecution to introduce evidence of the firearms, the ammunition, and a bulletproof vest recovered from Osborne's bedroom.

At trial, the prosecution presented evidence showing that, during a search conducted after Romero's death, the following items were found in Osborne's bedroom: (1) a loaded .357-caliber revolver; (2) a .40-caliber Glock pistol; (3) four firearms magazines; (4) shotgun shells; (5) a shotgun shell carrier; (6) three boxes of ammunition; (7) a clipboard containing paperwork for firearms; and (8) a bulletproof vest. The prosecution also presented evidence showing the Glock pistol could not have fired the .40-caliber cartridge casing found on the ground at the scene of the shooting.

## B. Governing Principles and Standard of Review

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) Per Evidence Code section 210, "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." "The test of relevance is whether the evidence 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' [Citation.] The trial court has broad discretion in determining the relevance of evidence, but lacks discretion to admit irrelevant relevance." (*People v. Benavides* (2005) 35 Cal.4th 69, 90.)

Evidence Code section 352 confers upon the trial court discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Against the backdrop of the principles above, our Supreme Court has addressed the admissibility of evidence regarding weapons found in the defendant's possession. On this point, it held: "When the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in [the defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Riser* (1956) 47 Cal.2d 566, 577.) This rule does not apply where the defendant's possession of a weapon is probative on an issue other than the defendant's character or disposition to commit a crime, however. (See *People v. Cox* (2003) 30 Cal.4th 916, 956 ["[W]hen

7

weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may be still admissible"]; see also *People v. Smith* (2003) 30 Cal.4th 581, 613 [evidence that police found a weapon and ammunition in the defendant's house, none of which was used in the murder, was admissible because it was relevant to his state of mind when he shot the victim].)

"We review the trial court's rulings on the admission of evidence for abuse of discretion." (*People v. Cowan* (2010) 50 Cal.4th 401, 462.) In so doing, "we review the [trial court's] ruling, not [its] reasoning and, if the ruling was correct on any ground, we affirm." (*People v. Geier* (2007) 41 Cal.4th 555, 582.)

### C.    Analysis

Osborne contends the trial court should have granted his motion in limine because "[t]here was no connection between the firearms, ammunition, and firearm related paraphernalia found in [his] bedroom and the crime." Thus, he asserts the evidence was irrelevant and, consequently, its admission created substantial danger of undue prejudice, as it "created a risk of the jury using that evidence to convict Osborne of murder simply because he is depicted as a violent and dangerous person who surrounds himself with firearms." The Attorney General responds: "[T]he challenged firearms and firearms-related evidence was admissible because it was probative on an issue other than [Osborne's] character or disposition to commit the charged crime[ ]." For the reasons discussed below, we agree with the Attorney General.

First, the disputed evidence was relevant to showing Osborne's identity as Romero's killer. Although the murder weapon was never recovered by the police, the prosecution established that a Sig Saur P229 pistol chambered in .40-caliber

8

could have fired the cartridge casing recovered from the ground near where Romero was found, as well as the projectile that killed her. A Sig Saur P229 pistol was registered to Osborne, but was not found amongst the firearms and firearm-related paraphernalia in his bedroom. By showing the Sig Saur P229 pistol registered to Osborne was missing from his collection of firearms and firearm-related paraphernalia, the disputed evidence had the tendency to prove *Osborne's* Sig Saur P229 – rather than a gun of a different type capable of shooting the casing found at the scene or the projectile that killed Romero, or someone else's Sig Saur P229 – was used to kill Romero.

In disputing the relevance of the challenged evidence, Osborne emphasizes he "did not contest identity" at trial. This argument is of no consequence. His concession on the identity issue did not absolve the prosecution of its obligation to prove the essential elements of the charged offense, all of which were put in issue by Osborne's not guilty plea. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1243-1244; see also *People v. Jones* (2011) 51 Cal.4th 346, 372.) Indeed, when it was presenting its case-in-chief, the prosecution could not have known Osborne was going to concede on identity, as he deferred his opening statement to the presentation of his case. Thus, regardless of his later concession, the prosecution was "entitled to prove its case and especially to prove a fact so central to the basic question of guilt as [identity]." (*People v. Steele*, at p. 1243.)

The challenged evidence was also relevant to proving Osborne's state of mind at the time of the shooting. Osborne's possession of multiple firearms, ammunition, and a bulletproof vest reflect he had firearms experience and was well aware of the danger that loaded guns pose to the safety of others, including

9

the specific risks and potentially dire consequences of a gunshot wound to the torso. No experienced gun owner would fail to comprehend the potentially fatal consequences of discharging a loaded weapon in the direction of another person. Consequently, the disputed evidence has a tendency to prove that, rather than blindly firing his weapon in Romero's direction while turned away from her, as he testified, Osborne aimed his weapon and deliberately shot her in the center of her back with the intention of inflicting a mortal wound.

In sum, Osborne's relevance argument fails because the challenged evidence had the tendency to prove two issues material to his guilt, namely, that he shot Romero, and that he did so with the intent to kill. In light of this conclusion, we reject his Evidence Code section 352 argument because it erroneously presumes the disputed evidence had little to no probative value.

Even assuming, *arguendo*, the trial court erred by admitting the evidence in question, we would find no prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818, 836-838 (*Watson*). Here, the evidence of Osborne's guilt was overwhelming. As discussed above, Osborne testified that on the morning of Romero's death, the couple got into a heated argument, during which she packed her bags, walked out of their home, and repeatedly said she was going to leave him. He also testified that, after following Romero around for 30 minutes and unsuccessfully attempting to convince her to return home, he reached under two layers of clothing, grabbed the handle of the Sig Saur P229 pistol resting flat against his back, lifted the gun up six inches to remove it from its holster, raised his arm to approximately shoulder height, and fired the weapon at Romero while she was walking away from

him. Romero's autopsy reflected she died of a single gunshot to the center of her back, which struck her heart, right lung, and liver. Forensics evidence confirmed a Sig Saur P229 like the one registered to Osborne could have shot the fatal bullet, as well as the cartridge casing found at the scene of the shooting. Osborne later told his mother he thought Romero intended to leave him and he shot Romero. Rather than checking on Romero's condition or summoning aid, Osborne discarded his gun, holster, and ammunition. After confessing the killing to his mother, he hid in a motel. Given this evidence demonstrating Osborne's identity as the killer, his motive, the deliberate means by which the killing was accomplished, and the evidence of consciousness of guilt, we conclude the asserted error would have been harmless beyond a reasonable doubt, and it is not reasonably probable that the exclusion of the challenged evidence would have resulted in a more favorable outcome for Osborne. (See *Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at pp. 835-836.)

## II. Firearm Enhancement

### A. Relevant Background

Following his conviction, Osborne filed a sentencing memorandum asking the trial court to strike the 25-year-to-life firearm enhancement under sections 12022.53, subdivision (h), and 1385. In support of his request, Osborne contended the evidence before the court reflected: (1) the crime was connected to Osborne's childhood trauma and substance abuse issues; and (2) the enhancement's application will result in a sentence exceeding 20 years. He also asserted there was no evidence before the trial court showing that, if the enhancement was dismissed, he was likely to "inflict[ ] physical injury or subject[ ] others to serious danger."

11

The trial court declined to strike the firearm enhancement. In so doing, the court first noted its analysis was governed by section 1385, subdivision (c), which – in its view – required it to weigh the statute's mitigating factors against whether striking the enhancement would endanger public safety. The trial court then rejected Osborne's contention that Romero's murder was linked to any mental illness or childhood trauma on his part.

Then, in addressing "public safety," the trial court observed Osborne was "capable" of causing harm, noting he "carries a gun with him pretty much all the time and has quite a bit of gun paraphernalia in his room, [and] is quite familiar with guns." Subsequently, the court stated: "I just don't see how you can say . . . the public is safe in any shape, way, or form when you have a man who is willing to shoot someone in the back when their back is turned and they have no way of defending themselves whatsoever. To me, that is the epitome of danger to public safety." Ultimately, the trial court concluded: "I find the defendant is a danger to public safety. If he can, on whatever trigger that triggered him in this particular case, shoot someone [he loves] in the back as easily as he did and then walk away, then he can do that to anybody in the world."

## B.     Governing Principles and Standard of Review

Pursuant to section 12022.53, subdivision (d), "a person who, in the commission of a felony specified in [certain statutes], personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." At sentencing, however, the trial court may strike or

12

dismiss this mandatory enhancement "in the interest of justice pursuant to [s]ection 1385 . . . ." (§ 12022.53, subd. (h).)

Section 1385, subdivision (c)(1) states, in relevant part: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so . . . ." "In exercising its discretion under [section 1385, subdivision (c)], the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (*Id.*, subd. (c)(2).) Potentially relevant to this appeal are the following mitigating circumstances: (1) "The application of the enhancement could result in a sentence of over 20 years"; (2) "The current offense is connected to mental illness" and (3) "The current offense is connected to prior victimization or childhood trauma." (*Id.*, subd. (c)(2)(C)-(E).)

In *People v. Walker* (2024) 16 Cal.5th 1024 (*Walker*), our Supreme Court clarified the analysis courts must employ when deciding whether to strike an enhancement under section 1385, subdivision (c). It held: "[A]bsent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present. [Citation.] In other words, if the court does not find that dismissal would endanger public safety, the presence of an

13

enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.'" (*Walker*, at p. 1029.) The Supreme Court also "emphasize[d] . . . that, in most cases, 'if the trial court finds that dismissal of an enhancement would endanger public safety, then it is hard to see how dismissal would further the interests of justice,' notwithstanding the applicability of any mitigating factors identified in subdivision (c)(2)." (*Id.* at p. 1033.)

We review for abuse of discretion both a decision not to strike an enhancement and a determination that to do so would endanger public safety. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.)

### C.    Analysis

Osborne contends the trial court abused its discretion by declining to strike the firearm enhancement because it: (1) erroneously found the enhancement's dismissal would endanger public safety; and (2) did not give sufficient weight to the fact that the enhancement's application will result in a sentence exceeding 20 years.[3] As discussed below, we are not persuaded by either of his arguments.

-----

3      In his opening brief, Osborne also asserts the trial court applied "the wrong standard in denying the motion to dismiss the enhancement" because it did not recognize section 1385's creation of a rebuttable presumption in favor of dismissal whenever its mitigating factors are present. His reply brief, however, does not dispute that our Supreme Court has since rejected the interpretation of section 1385 on which his argument is based,

14

In support of his first contention, Osborne raises two points. First, he asserts "there is no evidence supporting the finding that public safety would be endangered if the firearm enhancement were dismissed." This argument fails because the trial court's comments at the sentencing hearing reflect its ruling was appropriately based on the evidence presented at trial illustrating the circumstances of the crime, which demonstrated Osborne's willingness to resort to violence during his argument with Romero and the callous, calculated means by which he brought about her death. (See *People v. Mendoza, supra*, 88 Cal.App.5th at p. 299 [trial court properly considered "the circumstances of the crime" when determining the enhancement's dismissal would endanger public safety].) By suggesting the trial court should have focused on other evidence showing his sparse criminal record, lack of violent history, and childhood abuse and depression, Osborne essentially asks us to reweigh the evidence and substitute our judgment for that of the trial court. This is not our role as an appellate court reviewing for abuse of discretion. (See *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1250.)

Next, relying on *People v. Gonzalez* (2024) 103 Cal.App.5th 215 (*Gonzalez*), Osborne argues that, in determining the enhancement's dismissal would endanger the public, the trial court "erroneously relied upon an assessment of Osborne's *current* dangerousness and did not consider factors related to Osborne's *future* dangerousness including 'the date on which the defendant would be released under the revised sentence, and, [as

---

holding "section 1385, subdivision (c)(2) does not erect a rebuttable presumption in favor of dismissal that can only be overcome by a finding that dismissal endangers public safety." (*Walker, supra,* 16 Cal.5th at p. 1033.)

here] in the case of an indeterminate sentence, the safety valve that exists due to the review by the Board of Parole Hearings.'"[4] (Original italics.) This argument is unavailing because, as discussed below, *Gonzalez* is distinguishable.

In *Gonzalez*, the trial court declined to dismiss an enhancement, finding the defendant "'*presently* . . . does represent a danger to society.'" (*Gonzalez*, *supra*, 103 Cal.App.5th at p. 224, italics added.) In support of its ruling, the trial court interpreted section 1385 as "requir[ing] [it] to decide whether the defendant 'currently at the time of sentencing represent[s] a danger to society.'" (*Id.* at p. 227.) The appellate court vacated the sentence and rejected the trial court's "singular focus on whether the defendant *currently* poses a danger." (*Id.* at p. 228, original italics.) It explained that, in deciding whether an enhancement's dismissal would endanger the public, sentencing courts should employ a "'forward-looking inquiry'" that not only accounts for the defendant's current dangerousness, but also considers "the date on which the defendant would be released under the revised sentence, and, in the case of an indeterminate sentence, the safety valve that exists due to the review by the Board of Parole Hearings." (*Id.* at p. 229.)

Here, the trial court's comments at the sentencing hearing do not demonstrate it interpreted section 1385 in the manner

---

4       Generally, "a point raised for the first time in [a reply brief] is deemed [forfeited] and will not be considered, unless good reason is shown for failure to present it before." (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.) Because *Gonzalez*, *supra*, 103 Cal.App.5th 215, and *Walker*, *supra*, 16 Cal.5th 1024, were both decided after Osborne filed his opening brief, we find good cause for his presentation of his arguments based on these cases for the first time in his reply brief.

rejected by the appellate court in *Gonzalez*. Nor do its remarks reflect that the trial court expressly limited its analysis to Osborne's current dangerousness. (Cf. *Gonzalez*, *supra*, 103 Cal.App.5th at p. 224.) Instead, the court found Osborne's capacity for violence, in conjunction with the ease by which he acted on it to kill his unarmed girlfriend by shooting her from behind upon being "triggered" during an argument, posed a danger to "anybody in the world." It did not specify, let alone limit, the temporal nature of that risk.

On this record, we note "'[t]he trial court is not required to state reasons for declining to exercise its discretion under section 1385' [citations], and 'is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary' [citation]." (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637.) Accordingly, "[w]hen, as here, the record is silent as to" whether the court conducted a forward-thinking inquiry, "we presume that the trial court "'correctly applied the law.'"" (*Ibid.*) Because the record does not affirmatively rebut this presumption, we reject Osborne's argument based on *Gonzalez*.

We likewise reject Osborne's contention that resentencing is required under *Walker*, *supra*, 16 Cal.5th 1024. On this point, he asserts "[t]he trial court failed to place 'considerable value' on the mitigating circumstance that imposition of the enhancement will result in a sentence of over 20 years." *Walker*, however, held that sentencing courts "must assign significant value" to the presence of section 1385's mitigating circumstances only in cases where they "do[ ] not find that dismissal would endanger public safety." (*Walker*, at pp. 1029, 1038.) This is not one of those cases. As discussed above, the trial court appropriately determined the enhancement's dismissal *would* endanger public safety. It

therefore did not run afoul of *Walker* by considering – but not being swayed by – the fact that the enhancement's application would result in a sentence exceeding 20 years. Instead, the court's imposition of the firearm enhancement is consistent with *Walker*, where our Supreme Court "emphasize[d] . . . that, in most cases, 'if the trial court finds that dismissal of an enhancement would endanger public safety, then it is hard to see how dismissal would further the interests of justice,' notwithstanding the applicability of any mitigating factors identified in [section 1385] subdivision (c)(2)." (*Walker*, at p. 1033.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                                    CURREY, P. J.

We concur:



MORI, J.



SIGGINS, J.*

---

\*      Retired Presiding Justice of the Court of Appeal, First
Appellate District, assigned by the Chief Justice pursuant to
article VI, section 6 of the California Constitution.